UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

BANCO SANTOS, S.A.,

      Debtor in Foreign Proceeding,

_____/

Chapter 15
Case No. 10-47543-BKC-LMI

VÂNIO CESAR PICKLER AGUIAR,
as court-appointed Trustee for
Banco Santos S.A., et al.,

      Plaintiff,

v.

ESPIRITO SANTO BANK,

      Defendant.

_____/

Adversary Case No. _____

## COMPLAINT FOR DAMAGES AND
## DEMAND FOR JURY TRIAL

The Plaintiff, Vânio Cesar Pickler Aguiar, as court-appointed Judicial Administrator (the "Judicial Administrator" or "Mr. Aguiar") of Banco Santos, S.A. ("Banco Santos") and related entities (collectively, the "Banco Santos Estate")[1] sues the Defendant, Espirito Santo Bank, and alleges:

---

[1] In addition to his role as Judicial Administrator for Banco Santos, Mr. Aguiar has also been appointed Judicial Administrator for: (i) Atalanta Participações e Propriedades S.A.; (ii) Cid Ferreira Collection Empreedimentos Artísticos Ltda.; (iii) Maremar Empreendimentos e Participações Ltda.; (iv) Hyles Participações e Empreendimentos Ltda.; and (v) Finsec S.A. Companhia Securitizadora de Créditos Financeiros by the 2nd Bankruptcy and Judicial Reorganization Court of São Paulo, Brazil (the "Brazilian Bankruptcy Court"). An application pending before the Brazilian Bankruptcy Court would, if granted, also bring a further three

## THE PARTIES, JURISDICTION AND VENUE

1.    Vânio Cesar Pickler Aguiar was appointed as Judicial Administrator of Banco Santos by Judge Caio Marcelo Mendes Oliveira ("Judge Oliveira") of the 2nd Bankruptcy and Judicial Reorganization Court of São Paulo, Brazil on September 20, 2005.

2.    In 2011, the Judicial Administrator sought recognition of the Brazilian Banco Santos bankruptcy proceeding as a "foreign main" proceeding in the United States pursuant to Chapter 15 of the United States Bankruptcy Code.

3.    The United States Bankruptcy Court in and for the Southern District of Florida granted the requested recognition in an order dated January 13, 2011 (the "Recognition Order").

4.    Under the terms of the Recognition Order, the Judicial Administrator was granted all of the relief available pursuant to 11 U.S.C. §§ 1520 and 1521 without limitation.

5.    The Judicial Administrator, whose appointment and powers over and in relation to Banco Santos are set forth in the appointment order entered in Brazil pursuant to Brazilian law, is authorized and has standing to assert claims against third parties including, but not limited to, all legal and equitable claims available to the bankrupted entities forming part of the Banco Santos Estate and claims available to creditors of the Banco Santos Estate.

6.    The Recognition Order further entrusted the Judicial Administrator with the administration and realization of all or a part of the Banco Santos Estate's assets within the territorial jurisdiction of the United States.

---

entities (Broadening-Info Enterprises Inc., Bokara Corporation and Wailea Corporation) within the Banco Santos Estate and would result in Mr. Aguiar's appointment as Judicial Administrator for the three additional entities.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

7.     The Judicial Administrator was also authorized to examine witnesses, take evidence or seek the delivery of information concerning the assets, affairs, rights, obligations or liabilities of the bankrupted entities.

8.     Defendant Espirito Santo Bank ("ESB") is a Florida chartered bank headquartered in Miami, Florida and a "person" as defined in the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq*.  At all times relevant hereto, ESB provided, and continues to provide, a number of banking services from its Miami, Florida headquarters located initially at 999 Brickell Avenue, Miami, Florida 33131, and later at 1395 Brickell Avenue, Miami, Florida 33131.  ESB is a subsidiary of Portugal-based, Banco Espirito Santo.

9.     The Judicial Administrator brings this racketeering and tort action against ESB for wrongful acts that it and its co-conspirators committed in Florida, Uruguay, Brazil and elsewhere as part of an international scheme to unlawfully divert the assets of Banco Santos, at the time, an important Brazilian bank, through a pattern of unlawful activities constituting: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; bank fraud in violation of 18 U.S.C. § 1344; money laundering in violation of 18 U.S.C. § 1956; and monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.  ESB and its co-conspirators also undertook actions to cover up and conceal their scheme through fraud and obstruction, as well as other unlawful activities, including violations of Brazilian law.

10.     Over a period of years, a cohesive group of individuals and corporate entities, including Folgent Investment, S.A. ("Folgent"), Gainex Realty, S.A. ("Gainex"), Valence Insurance Company, Ltd. ("Valence Insurance"), Santos Capital Markets, Inc. ("Santos

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

Capital"), Valence Serviços e Investimentos (S.U.) LDA. ("Valence Serviços"), Edemar Cid Ferreira ("Cid Ferreira"), Ricardo Ferreira de Souza e Silva; ("Silva"), Rodrigo Rodrigues de Cid Ferreira ("Rodrigo"), Mario Martinelli ("Martinelli"), and ESB, associated together in an enterprise to accomplish the scheme. Cid Ferreira was the mastermind and controlled and/or beneficially owned a number of the members of the enterprise. In other instances the members of the enterprise were associated with or rendered services to Cid Ferreira and/or the other members of the enterprise. Acting together, and based upon mutual agreement and intent, these persons and entities knowingly conspired with each other to operate the referenced enterprise and to execute the scheme to the detriment of Banco Santos while unjustly benefiting themselves.

11.    As a result of ESB's and its co-conspirators' wrongful acts, Banco Santos was deprived of more than US$38.7 million. The Judicial Administrator seeks compensatory damages plus treble damages of up to US$116.1 million under its statutory RICO claim and other common law claims, as well as its Brazilian law claims, along with interest, attorneys' fees, and the costs of this action.

12.    This Court has personal jurisdiction over ESB pursuant to Fla. Stat. § 48.193, in that it: (a) operated, conducted, engaged in, or carried on a business or business venture in this state and had an office in this state at all times relevant hereto; (b) committed tortious acts within this state; and (c) acted as a Miami, Florida-based co-conspirator in the scheme described in this Complaint.

13.    This is an adversary proceeding filed in connection with the *In re Banco Santos, S.A.* matter, Case No. 10-47543-BKC-LMI. The Court has jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334.  This is a non-core proceeding and the Judicial Administrator does not consent to entry of final orders or judgment by the bankruptcy judge.[2]

14.     In perpetrating their fraudulent scheme, ESB and its co-conspirators have violated United States, Florida, and Brazilian law.  In connection with the acts and course of conduct alleged in this Complaint, ESB directly and indirectly used means and instrumentalities of interstate and foreign commerce, including the United States mail and wires, interstate telephone, the United States Federal Reserve, and the national and international banking systems to commit mail, wire and banking fraud as well as money laundering in violation of U.S. law.

15.     ESB's scheme has had, and was intended to have, wide ranging effects in Florida, where all of the ill-gotten proceeds in excess of US$38.7 million were purposefully directed, received and held by ESB, and subsequently laundered, prior to their onward illicit transfer to an offshore banking jurisdiction well known in the banking world to be a money laundering haven.

16.     In addition, a significant and meaningful part of the scheme, including planning and execution of the scheme, occurred in Florida and ESB repeatedly committed violations of state and federal law, i.e., "predicate acts," in Florida to perpetuate and to conceal the unlawful scheme.

17.     ESB engaged in a pattern of obstruction and concealment to perpetuate the fraud and prevent the discovery of its role and conduct in the fraudulent scheme and other wrongful conduct.  ESB created and distributed fraudulent audit confirmation letters, obstructed the Judicial Administrator's investigative efforts, responded in an untruthful

---

[2]  This Complaint contains a demand for a jury trial.

manner, and held back documents that would have disclosed the mechanisms employed in the execution of the fraudulent scheme and conversion of assets, including the mechanisms used to divert Banco Santos' assets to Cid Ferreira and his co-conspirators.

18.     Florida is ESB's state of incorporation and operation and the proceeds from the illicit scheme have been traced in and out of bank accounts located in Florida.  The receipt, processing and transmission of these ill-gotten gains in Florida, by a Florida bank, in a Florida bank account have caused an enormous financial impact and effect in Florida.

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

## BACKGROUND FACTS RELEVANT TO ALL COUNTS

### *The Banco Santos Bankruptcy*

20.     After a failure on the part of Banco Santos to meet a number of its debts and obligations and a Brazilian federal investigation into the reasons for that failure, the Central Bank of Brazil intervened in the affairs of Banco Santos in November 2004.   The intervention by the Central Bank in Banco Santos represented one of the largest bank failures in Brazilian history.  Thousands of creditors, many of them depositors with modest claims against the bank, were affected.

21.     From the outset, the failure of Banco Santos to meet those debts and obligations was suspected to have been the result of unscrupulous self-dealings by Cid Ferreira, the former head of Banco Santos, certain of his family members, and other officers, directors and managers of the bank.

22.     Following an initial investigation, the Central Bank of Brazil placed Banco Santos into extrajudicial liquidation on May 4, 2005.

23.    The Central Bank appointed Mr. Aguiar as liquidator of Banco Santos on the same date.

24.    When further investigation made clear that Banco Santos could not pay at least fifty percent (50%) of the unsecured debts it owed, Mr. Aguiar filed a petition requesting that the Bankruptcy Court with jurisdiction over the case convert the extrajudicial liquidation into a court-supervised liquidation/bankruptcy.

25.    From the time of the appointment of Mr. Aguiar as liquidator in the extrajudicial liquidation, and since, the oversight, management and control of Banco Santos was and has been under the control, management and oversight of Mr. Aguiar, to the exclusion of the previous officers and directors that previously were in control thereof.

26.    On September 20, 2005, Judge Oliveira of the 2nd Bankruptcy and Judicial Reorganization Court of São Paulo ordered that Banco Santos be placed into court-supervised liquidation.    Judge Oliveira also appointed Mr. Aguiar to be the Judicial Administrator of the Banco Santos Estate in liquidation.

27.    Under Brazilian law and the corresponding order appointing Mr. Aguiar, Mr. Aguiar has the power, right, and obligation to bring claims and assert rights on behalf of the entities in liquidation and on behalf of the creditors of that entity.    In fact, a Brazilian liquidation acts to eliminate the legal existence of the entity in liquidation, which is substituted by the body of creditors of the entities in liquidation, who, in turn, are represented by the judicial administrator.    In this case Mr. Aguiar, and may bring, on behalf of the estate, claims against any third parties through him within the estate.

### The Banco Santos-Related Criminal Case and Convictions in Brazil

28.    On December 2, 2004, shortly after the Central Bank of Brazil intervened in the affairs of Banco Santos, a criminal case was filed against Cid Ferreira, the former head of Banco Santos; his wife, Marcia de Maria Costa Cid Ferreira; his son, Rodrigo; his nephew, Silva; and some of the other directors and managers of Banco Santos (collectively referred to as the "Criminal Case").

29.    The charges in the Criminal Case involved a number of violations of Brazilian criminal law and had, at their core, allegations involving the criminal defendants' diversion and misuse of the capital and assets of Banco Santos to acquire assets for their personal use and to fund their lifestyles through an elaborate secret web of offshore entities and accounts used to commit and hide their crimes.

30.    On December 11, 2006, Cid Ferreira was convicted in the Federal Criminal Case and sentenced to twenty-one years in prison.

31.    His son, Rodrigo, and his nephew, Silva, were convicted and sentenced to sixteen years in prison each, while Cid Ferreira's wife, Marcia de Maria Costa Cid Ferreira, was convicted and sentenced to five years and four months in prison.

32.    The Criminal Court also ordered the forfeiture of a number of assets and accounts in and outside of Brazil.

33.    The Criminal Case was and is a matter of great public interest and notoriety in Brazil and has received extensive press coverage internationally given the identity of the convicted defendants, their wealth and their lavish lifestyles.

34.    Among other things, the various investigations and the Criminal Case revealed that millions of dollars (or Reais, the Brazilian currency) invested offshore were

misappropriated by Cid Ferreira and his immediate family from Banco Santos and affiliated entities to fund the purchase of, among other things, a lavish art collection valued in the tens of millions of United States dollars and the acquisition and remodeling of a residence in São Paulo, Brazil at a cost of approximately US$60 million.

35.    As was later learned, and as described in more detail herein, ESB was essential to, and intimately involved in the process by which Cid Ferreira and his co-conspirators moved Banco Santos' funds offshore from Brazil, to the detriment of Banco Santos and its creditors. The scheme was, in fact, made possible by the laundering of the same funds at and by ESB in Miami, Florida.

***Extension of the Banco Santos Bankruptcy to Other Entities***

36.    In 2007, Mr. Aguiar and the Public Attorney assigned to the Banco Santos case filed a petition to extend the effects of the Banco Santos bankruptcy to the following entities:

   a.   Atalanta Participações e Propriedades S.A. ("Atalanta");

   b.   Cid Ferreira Collection Empreedimentos Artísticos Ltda. ("Cid Collection");

   c.   Maremar Empreedimentos e Particpações Ltda. ("Maremar");

   d.   Hyles Particpações e Empreedimentos Ltda. ("Hyles"); and

   e.   Finsec S.A. Companhia Securitizadora de Créditos Financeiros ("Finsec").

37.    Under Brazilian bankruptcy law, where there has been "patrimonial confusion" (or mixing) of assets of a company with those of another person or assets have been misappropriated from a company by a director or shareholder, the Court can extend its bankruptcy jurisdiction by ordering the extension of the effects of the bankruptcy to any person or entity who has been unjustly enriched by, or involved in, such wrongful activity. This can result in the bankruptcy of persons, including shareholders or directors, who form

part of a common economic group that has been involved with, or participated in, such activity.

38.     Based on their respective investigations, the Judicial Administrator and the Public Attorney petitioned the Brazilian Bankruptcy Court to extend the Banco Santos' bankruptcy to the five additional companies listed above.

39.     On July 4, 2007, the Bankruptcy Court ordered that the effects of the Banco Santos bankruptcy be extended to include those five companies.

40.     In the same bankruptcy extension judgment, the Bankruptcy Court made important findings regarding the Banco Santos fraud and the methods and strategies employed by the criminal defendant-fraudsters and their co-conspirators including:  fraud on Banco Santos; fraud on the auditors of the bank; fraud on the Brazilian Central Bank; and, significantly, the use of offshore vehicles and offshore accounts to steal and secrete the assets of Banco Santos for their own benefit.

41.     In 2013, following additional investigative work in and outside Brazil, the Judicial Administrator and the Public Attorney petitioned the Brazilian Bankruptcy Court to extend the Banco Santos bankruptcy to a further three additional companies.

42.     This second application to extend the Banco Santos bankruptcy to Broadening-Info Enterprises Inc., Bokara Corporation and Wailea Corporation remains pending as of the filing of this Complaint.

43.     However, the Brazilian Bankruptcy Court did issue a preliminary seizure order on June 19, 2013, as against the assets of the three entities covered by the 2013 bankruptcy extension petition, which is in force today.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

*Discovery of Fraudulent ESB Audit Confirmation Letters and Discovery of ESB's Involvement in the Illicit Diversion of Assets from Banco Santos*

44.    As described in paragraphs 2 through 7 above, the Judicial Administrator applied for and obtained recognition of the Brazilian Banco Santos bankruptcy proceeding in the United States in 2011.

45.    In accordance with the powers granted to him by the Chapter 15 Recognition Order, the Judicial Administrator has issued a number of subpoenas in the United States to obtain evidence to assist him in his investigation of the dealings relating to Banco Santos and its assets as well as in his investigation of various other companies owned and controlled by Cid Ferreira and his co-conspirators that were used to strip assets from Banco Santos.

46.    Among these were a set of subpoenas to ESB made possible by an investigative breakthrough in Brazil in early 2011, and unsuccessful efforts to develop that line of investigation through informal contact between the Judicial Administrator and ESB, in response to which ESB evaded responding to the request and Martin Prego ("Prego"), on ESB's behalf, ultimately declared that a subpoena would be required.

47.    Specifically, on January 20, 2011, the Judicial Administrator gained access to Cid Ferreira's and his wife's residence in São Paulo, Brazil, during an eviction process executed at the residence.   During the course thereof, a number of Banco Santos Estate-related documents housed at that location came into the possession of the Judicial Administrator for the first time.

48.    Among the documents the Judicial Administrator uncovered at the Cid Ferreira residence were certain audit confirmation letters dated January 22, 2004, issued by ESB and addressed to PriceWaterhouseCoopers ("PWC") in São Paulo, Brazil, involving three entities named Valence Insurance Company Ltd. ("Valence Insurance"); Santos Capital Markets, Inc.

("Santos Capital"); and Valence Serviços e Investimentos (S.U.) LDA. ("Valence Serviços"). True and correct copies of the audit confirmation letters found at the Cid Ferreira residence on January 20, 2011, are attached here as **Exhibit 1**.

49.     At the time, it was suspected, based on the Judicial Administrator's investigation, that Valence Insurance, Santos Capital, and Valence Serviços were controlled by Cid Ferreira and used by him and his co-conspirators to divert monies out of Banco Santos. The mechanisms and manner in which those entities were utilized to divert monies, however, was yet unknown.

50.     As to ESB, the Judicial Administrator's knowledge at that time was limited to knowledge that Banco Santos historically had had accounts at ESB and that other related entities of which he was not the Judicial Administrator may also have had some dealings or accounts. That said, the Judicial Administrator had no knowledge and could not have had any knowledge as to any funds belonging to Banco Santos being used as collateral by ESB or any active involvement by ESB at that time, but rather, learned such information later.

51.     Upon further review, the Judicial Administrator determined that the audit confirmation letters contained the following pledge language: "[t]he above TD's[3] have been pledged as collateral in support of guarantees given to Espirito Santo Bank."

52.     In addition to the above-cited collateral pledge language, each of the letters found at the Cid Ferreira residence contained additional details about the guarantee of specific loan transactions by the specific entity which was the subject of the audit confirmation letter as follows:

---

[3] "TD" or "T/D" is shorthand for "time deposit," a term used in the body of the audit confirmation letters to describe the account type. In other instances the accounts are referred to as "certificate of deposit" or "CD" accounts. This Complaint makes use of those terms interchangeably.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

a. "Valence Insurance Co. Ltd. Guarantees along with other related entities the following credit transactions: Folgent Investment S.A. (loan) $6,250,000.00";

b. "Santos Capital Markets, Inc. guarantees along with other related entities the following credit transactions: Folgent Investment S.A. (loans) $10,073,378.00"; and

c. "Valence Servicos E Investimentos (S.U.) LDA Guarantees along with other related entities the following credit transactions: Gainex Realty, S.A. (loans) $4,700,000.00 [and] Folgent Investments, S.A. (loans) $14,485,320.00".

See **Exhibit 1**.

53.     The Judicial Administrator decided to investigate these transactions to determine if they might lead to offshore assets of Banco Santos.  As part of his investigation, he requested from Santos Seguradora, S.A. ("Santos Seguradora") and Invest Santos Negocios, Administraçao e Partipaçao Ltda. ("Invest Santos"), the parent entities for Valence Insurance, Valence Serviços and Santos Capital, copies of the audit confirmation letters sent by ESB to the independent auditor in 2004.  In response to his request, the Judicial Administrator was provided copies of the audit confirmation letters issued by ESB for the period ending December 31, 2003.  However, the audit confirmation letters provided by these entities, while similar to the copies attached here as **Exhibit 1**, lacked the collateral pledge language cited above.  In addition, one of the letters was dated February 12, 2004, instead of January 22, 2004.  See **Exhibit 2**.

54.     In an effort to understand these discrepancies and the underlying facts, on April 28, 2011, the Judicial Administrator emailed ESB, specifically, Ms. Margarita Angulo-

Levine ("Ms. Angulo-Levine"), Vice-President and Credit Manager at ESB and the author of
the subject audit confirmation letters, to seek an explanation as to the inconsistent letters.

55.    As a result of the Judicial Administrator's correspondence, a telephone call
followed between the Judicial Administrator and ESB, through Ms. Angulo-Levine, that
same day.  The Judicial Administrator also forwarded to Ms. Angulo-Levine at ESB copies
of the audit confirmation letters after their call.  Neither Ms. Angulo-Levine nor anyone else
at ESB responded immediately, despite repeated attempts by him to follow up with her.

56.    Tellingly, discovery obtained by the Judicial Administrator from ESB more than
one year after the April 2011 correspondence and conference call, revealed the existence of
an internal email exchange between Ms. Angulo-Levine and Mr. Prego, Senior Vice-
President and Head of Compliance at ESB, on the day of the Judicial Administrator's initial
call with her, April 28, 2011.  In that exchange, Ms. Angulo-Levine wrote to Mr. Prego,
forwarding the Judicial Administrator's emails to her stating:  "FYI.  I am checking our
records to see ehat [sic] we sent.  **I want to involve you as one letters [sic] might be
fraudulent**."  (emphasis added).  Mr. Prego responds to Ms. Angulo-Levine that same day
with the following instructions:  "Please call me…Thanks."  See **Exhibit 3**.

57.    A few days later, ESB, this time through Mr. Prego, contacted the Judicial
Administrator and advised him that ESB would not produce any documents absent service of
a subpoena.

58.    The Judicial Administrator thus continued his investigations by conferring
directly with PWC in Brazil.  PWC Brazil informed him in June 2011, that only the letters
without any pledge information had been received by PWC.  Faced with these differing
versions of the documents, the Judicial Administrator served a subpoena on ESB on August

12, 2011, requesting the production of documents relating to Banco Santos and other related entities, including the three entities for which ESB issued the audit confirmation letters in 2004, and which were discovered in January 2011.

59.     Specifically, Request No. 7 in the August 12, 2011, subpoena sought the production of "[a]ny and all documents relating to any of Customers' accounts or banking activity during the Relevant Period [since inception of the relationship to the present], including, but not limited to, correspondence."

60.     The audit confirmation letters issued by ESB and executed by Ms. Angulo-Levine were indisputably responsive to this request and highly relevant to the Judicial Administrator's investigation.

61.     On September 8, 2011, ESB produced 1,468 pages of documents to the Judicial Administrator in response to his subpoena.  The audit confirmation letters were not produced by ESB despite the fact that, based on previous discussions with the Judicial Administrator, ESB knew that the audit confirmation letters were the focus of the Judicial Administrator's investigation.

62.     In January 2012, the Judicial Administrator, through counsel, followed up with ESB to seek the production of the audit confirmation letters.  ESB acknowledged receipt of the follow-up request, but did not respond.

63.     Further requests were made by the Judicial Administrator on February 3 and 27, 2012.

64.     Finally, on February 27, 2012, ESB replied through its Chief Compliance Officer, Kevin Escott ("Mr. Escott"), as follows:  "[w]e have gone over the files **again** and **we cannot locate any audit confirmation letters**."  See **Exhibit 4**, (emphasis added).

65.     Mr. Escott's response wholly failing to acknowledge any audit confirmation letters, is inconsistent with Ms. Angulo-Levine's April 28, 2011, e-mail to Mr. Prego (which was yet unknown to the Judicial Administrator) wherein she indicated she was checking ESB's records to see what was sent to PWC "as *one* letters [sic] may be fraudulent." (emphasis added).  That is to say, the February 27, 2012, communication from ESB stating that it could not locate "any audit confirmation letters" is irreconcilable with Ms. Angulo-Levine's evident awareness of the letters almost one year earlier.

66.     As evidenced by the irreconcilable nature of ESB's positions with respect to the audit confirmation letters, ESB has engaged in repeated and concerted actions to delay and obstruct the Judicial Administrator's investigation on the issue of the audit confirmation letters notwithstanding clear evidence of their existence.

67.     ESB's efforts to conceal and intentionally refrain from producing relevant evidence that would have allowed Mr. Aguiar to discover ESB's true role in harming the Banco Santos Estate and its creditors was also evidenced by its failure to produce the legal and credit files for the borrowers and guarantors, even though, as Mr. Prego admitted during his deposition, such documents were responsive to the first subpoena.

68.     The Judicial Administrator replied to Mr. Escott's email and attached a copy of the audit confirmation letters including the pledge language, reiterating his request that the letters, as contained in ESB's files, had to be located and produced.

69.     On February 29, 2012, Mr. Robert Stewart ("Mr. Stewart"), ESB's registered agent at the time and its outside general counsel, contacted the Judicial Administrator, through counsel.  Mr. Stewart requested a copy of the Judicial Administrator's e-mail exchange with ESB regarding the subject audit confirmation letters, which was provided to

him.  On that same date, Mr. Stewart reiterated that ESB had already produced all of the responsive documents, but that, in abundance of caution, he had advised the bank that it should make one more thorough sweep of its records.

70.    On April 3, 2012, ESB made a supplemental document production consisting of 82 pages, including several correspondences between ESB and Banco Santos and related entities.   However, neither set of the audit confirmation letters was included in this supplemental production by ESB.

71.    On the same day of receipt of the supplemental document production, the Judicial Administrator again followed up with ESB regarding the outstanding production of the audit confirmation letters.

72.    On April 12, 2012, almost one full year after the Judicial Administrator's initial contact with Ms. Angulo-Levine, and months after service of the subpoena to which they were clearly responsive, ESB finally produced a copy of the audit confirmation letters.  The audit confirmation letters that were produced by ESB contained the pledge language first seen in the audit confirmation letters found by the Judicial Administrator at the Cid Ferreira residence and also contained a fax header appearing to record transmission of those audit confirmation letters via facsimile to a facsimile number in Brazil, possibly PWC's.  See **Exhibit 5**.

73.    The Judicial Administrator wrote ESB requesting a sworn affidavit from Ms. Angulo-Levine authenticating the audit confirmation letters produced by ESB, which was received by the Judicial Administrator on May 4, 2012.  See **Exhibit 6**.  Ms. Angulo-Levine's affidavit, which she signed as Senior Vice-President at ESB, in which capacity she served as records custodian for the audit confirmation letters, states that the audit

confirmation letters provided to the Judicial Administrator on April 12, 2012, have been kept in the course of regularly conducted business of the bank and were made at or near the time thereof by or from records kept in the regular course of business of the bank.

74.     During April 2012, the Judicial Administrator also corresponded with PWC in Brazil regarding the audit confirmation letters, including the set provided by ESB on April 12, 2012.

75.     On May 3, 2012, the Judicial Administrator received a letter from PWC in which PWC maintained that it never received copies of the set of audit confirmation letters disclosing that all of the account balances were subject to a collateral pledge.  PWC instead asserted that it received audit confirmation letters from ESB dated January 22, 2004, and February 12, 2004, but both without the collateral pledge language.  Furthermore, PWC also asserted that it could not confirm receipt of the fax including the audit confirmation letters notwithstanding the copies with facsimile transmission reports produced by ESB.

76.     In late May 2012, the Judicial Administrator and ESB engaged in discussions as to whether someone other than Ms. Angulo-Levine may have forged her signature on the set of audit confirmation letters without the pledge language.  As a result of these discussions and statements from ESB, indicating lack of knowledge regarding the provenance of the audit confirmation letters without the pledge language, the Judicial Administrator requested a revised affidavit from Ms. Angulo-Levine.

77.     Specifically, the Judicial Administrator requested a revised version of Ms. Angulo-Levine's affidavit that would include language confirming that the true and accurate set of audit confirmation letters contained the pledge language present in the copies produced by ESB on April 12, 2012 and further confirming that this was the set that was actually sent

by ESB to PWC, that Ms. Angulo-Levine had reviewed the set of audit confirmation letters without the pledge language, and that the signature appearing on those letters without the pledge language was forged and not her own.

78.    The requested revised affidavit from Ms. Angulo-Levine was never received.

79.    Instead, on or about July 10, 2012, ESB's counsel represented to the Judicial Administrator that, for reasons that he could not comprehend, Ms. Angulo-Levine had told him that she was the person that issued the two sets of audit confirmation letters, one with and the other without the pledge language.

80.    ESB indicated that Ms. Angulo-Levine first issued the set of letters with the pledge language on January 22, 2004, and that, in February 2004, again for reasons not known, Ms. Angulo-Levine re-issued the same audit confirmation letters, but this time, without the pledge language.  Additionally, some of the letters signed in February 2004, bore the original January 22, 2004 date.

81.    As a result of this disclosure, the Judicial Administrator asked that Ms. Angulo-Levine amend her original affidavit so that it clearly stated that she issued the two sets of audit confirmation letters and that both sets were sent to PWC.  The Judicial Administrator also asked for the production of any correspondence requesting that Ms. Angulo-Levine issue the set of audit confirmation letters without the pledge language and that those communications be appended to her new affidavit.

82.    After ESB stalled for several months, on September 20, 2012, the Judicial Administrator informed ESB that he could not continue waiting for Ms. Angulo-Levine's amended affidavit and that, unless the same was forthcoming, the Judicial Administrator would be forced to issue a subpoena to take Ms. Angulo-Levine's deposition.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

83.    That same day, ESB replied, in part, as follows: "We have been unable to prepare the [revised] affidavit.  Accordingly, you should proceed with a deposition.  We apologize for the delay in response."

84.    In response to further communications from the Judicial Administrator, ESB, through its outside counsel, further stated: "Frankly, we have wrestled with this, hence the delay.  The upshot is that we think that the facts cannot be elegantly shoe-horned into an affidavit (that would probably invite more questions) so the best thing is just to go ahead with a subpoena for deposition.  In that regard, since I am not admitted to the bankruptcy court, I will not be representing the bank at that deposition.  The bank has other bankruptcy counsel."  See **Exhibit 7**.

85.    Facing this latest development, and still without a clear picture of the events surrounding the issuance of the different sets of audit confirmation letters, the Judicial Administrator served a second subpoena on ESB in October, 2012 a copy of which is attached here as **Exhibit 8**, specifically requesting:

    a.  Copies of all documents relating to the audit confirmation letters attached hereto as Exhibit A and B, including but not limited to:  (i) the request(s) for the issuance of the audit confirmation letters as issued by Customers (including any of their agents); (ii) the request(s) if any to remove the collateral pledge language form the audit confirmation letters attached hereto as Exhibit A; (iii) the facsimile transmission reports and mailing labels relating to the transmission of the audit confirmation letters to PWC or any other recipient; and (iv) any correspondence transmitting the audit confirmation letters attached hereto as Exhibit A and B;

    b.  Copies of the audit confirmation letters attached hereto as Exhibit B as they are maintained in Your business records including any mailing label and facsimile transmission reports;

    c.  Audit confirmation letters issued by You relating to Customers for the Relevant Period;

d.  All correspondence, including but limited to emails exchanged between Margarita Angulo-Levine, Martin Prego and Kevin Escott relating to: (i) the drafting, revising and transmission of the audit confirmation letters attached hereto as Exhibit A and B; (ii) Your efforts to comply with the Subpoena attached hereto as Exhibit E and related follow up concerning the production by You of the audit confirmation letters attached hereto as Exhibit A and your efforts, if any, to produce the audit confirmation letters attached hereto as Exhibit B to the [Judicial Administrator];

e.  All Documents received by You requesting the issuance of audit confirmation letters relating to Customers or Customer's accounts maintained with You for the Relevant Period; and

f.  All correspondence exchanged by You and: (i) Edemar Cid Ferreira; (ii) Alvaro Zuchile Cabral; and (iii) Edison Arisa.

86.    The October 2012 subpoena also requested the tendering of a Rule 30(b)(6) corporate representative for examination.

87.    ESB ultimately agreed it would produce Ms. Angulo-Levine for the examination in November 2012.

***ESB's Documents Reveal ESB's Complicity and Substantial Assistance in the Diversion of More than US$38.7 Million from Banco Santos Between 2001 and 2004 Through the Granting and Use of Multiple Back-to-Back Loans to Folgent and Gainex***

88.    During this time, the Judicial Administrator and his team continued their review of the documents produced in tranches by ESB over the course of several months since service of the first Subpoena in August of 2011, over a year prior.

89.    ESB's documents evidenced several troubling facts which were further developed and confirmed during the Rule 2004 examination of Ms. Angulo-Levine and, later, the Rule 2004 examination of Mr. Carlos Lloreda ("Mr. Lloreda"), who had been an ESB credit manager and later the person in charge of the relevant credit files within ESB's private banking unit in Miami.

90.     For the first time, it became apparent that the audit confirmation letters that had first attracted the Judicial Administrator's attention to ESB were but one piece of a significant, multi-year, and multi-million dollar, banking relationship that ESB had enjoyed with Banco Santos, as it existed prior to the Central Bank's intervention. The Judicial Administrator had previously had knowledge only that Banco Santos had had a historical banking relationship with ESB. Prior to this time, the Judicial Administrator did not know nor have any reason to know of the extent of the relationship or ESB's involvement with some of Banco Santos' shareholders, officers and directors and entities created by or related to such individuals, significantly, including the use of Banco Santos funds as collateral for loans to such third parties for the benefit of Cid Ferreira to its detriment.

91.     Specifically, ESB had served as banker to Folgent and Gainex, two Uruguayan bearer shares companies formed by the Doldan Amarelli law firm in Montevideo, Uruguay at the behest of one of the former heads of Banco Santos, Cid Ferreira. Mr. Martinelli was the main point of contact between Cid Ferreira and the Doldan Amarelli law firm.

92.     Folgent and Gainex are two Uruguayan "sociedades anonimas financieras de inversion." Under Uruguayan corporate law applicable at the time of the relevant fully collateralized loans, i.e., back-to-back loan transactions, this particular form of corporate structure allowed for the issuance of bearer shares and the concealment of the identity of the ultimate beneficial owner (or owners) of the companies.

93.     ESB's documents reveal that between 2001 and 2004, Folgent and Gainex were the borrowers in eight loan transactions that were simultaneously fully collateralized, with ESB acting as lender and depositing institution, thereby constituting back-to-back loans totaling in excess of US$38.7 million, inclusive of interest. The Doldan Amarelli law firm in

22

Uruguay received referral fees from ESB for sourcing the Folgent and Gainex loans and whenever any of the eight loans were renewed.

94.     These eight back-to-back loans were one-hundred percent (100%) cash collateralized by the three same entities that were the subject of ESB's audit confirmation letters, namely:  Valence Insurance; Valence Serviços; and Santos Capital.  Each of these three entities were themselves controlled by Cid Ferreira and owned, as wholly owned subsidiaries, by Banco Santos.  See organizational chart produced from ESB from its own records at **Exhibit 9**.

95.     The source of the funds used to collateralize the eight back-to-back loans was known to ESB to be Banco Santos, a fact which is prominently confirmed in ESB's own account opening documents for the entities listed in the previous paragraph and a fact first learned by the Judicial Administrator upon review of ESB's production of documents in response to the first subpoena.  See **Exhibit 10**.

96.     The documents obtained from ESB further evidence knowledge by ESB that Folgent and Gainex were themselves owned by Banco Santos, with ultimate beneficial ownership believed to have rested with Cid Ferreira.  See **Exhibit 11**.

97.     The lender-borrower relationships between ESB, Folgent and Gainex, cash collateralized with Banco Santos' funds, garnered ESB significant revenue for years and coincided in time with the exact period during which Cid Ferreira and his co-conspirators were most actively diverting and converting Banco Santos' assets out of the bank for their own personal gain and to the detriment of Banco Santos, its employees, and its creditors.  This diversion and conversion of Banco Santos's assets ultimately caused it to collapse in one of the largest bank failures in Brazilian history.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

98.     ESB, in its role as banker to Folgent and Gainex, participated in, facilitated, and benefitted from, large back-to-back loan transactions known industry-wide to be a favorite tool for money laundering.  Indeed, the use of back-to-back loans is among the oldest and most obvious of money laundering techniques.

99.     Specifically, the eight loan transactions involving Folgent and Gainex, each one hundred percent (100%) cash collateralized with funds from Banco Santos, (i.e., back-to-back loans), allowed Cid Ferreira and his co-conspirators to launder funds through ESB and to illegally transfer the laundered funds on to Cid Ferreira-controlled bank accounts offshore, including to Antigua and Barbuda, which was at that time, black-listed by the U.S. Treasury's Financial Crimes Enforcement Network (FINCEN) on account of its weak banking and anti-money laundering controls and regulations.

*100.*     During 2001 to 2004, the period when the Folgent and Gainex back-to-back loans were extended and serviced, ESB came into possession of extensive information that alerted it to the illicit nature of the Folgent and Gainex back-to-back loan transactions.  In every instance, ESB actively participated in and furthered the illicit aims and actions of Cid Ferreira and his co-conspirators, becoming itself, through these actions, a co-conspirator in the conspiracy to improperly divert the assets of Banco Santos.  ESB, through its agents, including but not limited to Victor Balestra ("Balestra"), Mark North ("North"), and Alvaro Diez de Medina ("Medina"), knew or deliberately shielded themselves from clear evidence that the back-to-back loan transactions were unlawful.

*The Eight Back-to-Back Loans Used to Divert in Excess of US$38.7 Million from Banco Santos Constituted Acts Forming a Pattern of Mail, Wire and Bank Fraud, of Money Laundering and Involving Monetary Transactions in Property Derived from Specified Unlawful Activity*

### I.     Gainex Loan Number XXXX1001

101.     ESB disbursed $4,000,000.00 to Gainex on November 20, 2001, in the form of a loan.  See **Exhibit 12**.

102.     This loan was fully cash collateralized with a certificate of deposit issued by ESB to Valence Serviços. See **Exhibit 13**.

103.     The loan proceeds were then deposited into a money market account held by Gainex with ESB.

104.     The applicable interest rate for the loan and the certificate of deposit backing up the same loan was identical – five percent (5%).

105.     On November 20, 2001, the same date the initial loan proceeds were disbursed, the full amount of $4,000,000.00 was transferred from Gainex's money market account to a bank account with Standard Chartered Bank ("Standard Chartered) in New York, the correspondent bank for Bank of Europe, Ltd, an Antigua and Barbuda-based offshore bank beneficially owned by Cid Ferreira's family.  See **Exhibit 12**.

106.     This loan was renewed twice in November 2002 and 2003.

107.     The loan was paid off by liquidating the collateral on November 10, 2004, and the payoff amount was $4,938,777.78.

108.     ESB obtained $98,500.00 in loan origination fees for the issuance and subsequent renewals of this particular back-to-back loan.

## II.    Folgent Loan Number XXXX7001

109.    ESB disbursed $5,500,000.00 to Folgent on October 19, 2001, in the form of a loan.  See **Exhibit 14**.

110.    This loan was fully cash collateralized with a certificate of deposit issued by ESB to Santos Capital, which thereby constituted a back-to-back loan as was the case in all eight loan transactions described herein.  See **Exhibit 15**.

111.    The loan proceeds were deposited into a money market account held by Folgent with ESB.

112.    The applicable interest rate for the loan and the certificate of deposit backing up the same was identical – five percent (5%).

113.    On October 19, 2001, the same date the initial loan proceeds were disbursed, the full amount of $5,500,000.00 was transferred from Folgent's money market account to a bank account with Standard Chartered, the correspondent bank for Bank of Europe, Ltd, an Antigua and Barbuda-based offshore bank beneficially owned by Cid Ferreira's family.  See **Exhibit 14**.  Upon information and belief, and based upon later course of conduct, the beneficiary of this transfer was Cid Ferreira through a Cid Ferreira-controlled entity.

114.    This loan was renewed twice in October 2002 and 2003.

115.    The loan was paid off by liquidating the collateral on October 22, 2004, and the payoff amount was $6,382,151.57.

116.    ESB obtained $132,756.43 in loan origination fees for the issuance and subsequent renewals of this loan.

### III.    Folgent Loan Number XXXX7002

117.    ESB disbursed $8,000,000.00 to Folgent on December 21, 2001, in the form of a loan. See **Exhibit 16**.

118.    This loan was fully cash collateralized with two certificates of deposit issued by ESB, one to Valence Insurance and the other one to Valence Serviços. See **Exhibit 17**.

119.    The loan proceeds were deposited into a money market account held by Folgent with ESB.

120.    The applicable interest rate for the loan and the certificates of deposit backing up the same was identical – five percent (5%).

121.    On December 19, 2001, the same date that this loan was approved by ESB, $3,759,986.23 was transferred from Folgent's money market account to a bank account with Standard Chartered, the correspondent bank in New York for Bank of Europe, Ltd, an Antigua and Barbuda-based offshore bank beneficially owned by Cid Ferreira's family. Upon information and belief, and based upon later course of conduct, the beneficiary of this transfer was Cid Ferreira through a Cid Ferreira-controlled entity.

122.    On December 21, 2001, the same date the loan proceeds were disbursed, $4,240,013.35 was transferred from Folgent's money market account to a bank account with Safra National Bank of New York.  Upon information and belief the Safra National Bank account was held by Alsace-Lorraine, Ltd., a British Virgin Island company now known to be beneficially owned by Cid Ferreira. See **Exhibit 16**.

123.    This loan was renewed twice in December 2002 and 2003.

124.    The last renewal of this loan took place on December 20, 2003.  The outstanding balance for this loan then was $8,831,670.33.

125.    The loan was paid off by liquidating the collateral on or about November 17, 2004, after Folgent informed ESB on November 11, 2004, the day before the Central Bank of Brazil intervened in Banco Santos, that it would be unable to pay this and another loan coming due in December 2004 as a result of "unexpected circumstances." See **Exhibit 18**.

126.    Mr.    Lloreda instructed Sunny Casanova, a member of ESB's operations department to "cancel the [certificates of deposit] which collateralize these loans and apply proceeds to the cancellation of the loans."

127.    This loan accrued approximately $402,869.35 in interest since the second renewal.

128.    The payoff amount was approximately $9,234,539.88.

129.    ESB obtained $188,863.36 in loan origination fees for the issuance and subsequent renewals of this loan.

**IV.    Folgent Loan Number XXXX7003**

130.    ESB disbursed $7,000,000.00 to Folgent on June 25, 2003, in the form of a loan. See **Exhibit 19**.

131.    This loan was fully cash collateralized with three certificates of deposit issued by ESB, one to each of the guarantors, Valence Insurance, Valence Serviços and Santos Capital. See **Exhibit 20**.

132.    The loan proceeds were deposited into a money market account held by Folgent with ESB.

133.    The applicable interest rate for the loan and the certificate of deposit backing up the same was identical – five percent (5%).

134.    On June 26, 2003, the day after the initial loan proceeds were disbursed, $7,000,045.00 was transferred from Folgent's money market account to a bank account held by Alsace-Lorraine, Ltd., a British Virgin Islands company beneficially owned by Cid Ferreira. <u>See</u> **Exhibit 19**.

135.    Folgent defaulted on this loan when it came due.

136.    ESB, however, agreed to extend the maturity date to July 26, 2004.  On July 23, 2004, Zertond S.A. ("Zertond"), another Cid Ferreira controlled entity, made a partial payment on this loan of $2,638,411.00.  <u>See</u> **Exhibit 21**.  On July 27, 2004, the CD#x3959 of Valence Serviços partially backing up this loan was cancelled and the funds, $2,638,410.50 were wired, upon information and belief, to Zertond's account with Winterbotham in the Bahamas. <u>See</u> **Exhibit 22**.

137.    The loan was paid off by liquidating the collateral, **as expressly authorized by the President of Banco Santos** (believed to be a reference to Cid Ferreira), after it matured, on August 10, 2004. <u>See</u> **Exhibit 23**.

138.    The payoff amount was $7,397,443.44.

139.    ESB obtained $57,076.36 in loan origination fees for the issuance and subsequent renewals of this loan.

**V.    <u>Folgent Loan Number XXXX7004</u>**

140.    ESB disbursed $4,750,000.00 to Folgent on June 27, 2003, in the form of a loan. <u>See</u> **Exhibit 19**.

141.    This loan was fully cash collateralized with two certificates of deposit issued by ESB, one to Valence Insurance, and the other to Santos Capital.  <u>See</u> **Exhibit 24**.

142.    The loan proceeds were deposited into a money market account held by Folgent with ESB.

143.    The applicable interest rate for the loan and the certificate of deposit backing up the same was identical – five percent (5%).

144.    On June 27, 2003, the very same date the initial loan proceeds were disbursed, the exact amount of $4,750,000.00 was transferred from Folgent's money market account to a bank account held by Alsace-Lorraine, Ltd., a British Virgin Islands company beneficially owned by Cid Ferreira. See **Exhibit 19**.

145.    Folgent defaulted on this loan when it came due on June 25, 2004.

146.    ESB, however, agreed to extend the maturity date to July 26, 2004.  On July 29, 2004, Zertond, another Cid Ferreira controlled entity, made a partial payment on this loan of $3,000,000.00.  See **Exhibit 21**.  On July 30, 2004, the outstanding principal of CD#x3959 of Valence Insurance partially backing up this loan was cancelled and the funds, $3,000,000.00, were wired, upon information and belief, to Zertond's account with Winterbotham in the Bahamas.  See **Exhibit 25**.

147.    The loan was paid off by liquidating the collateral, **as expressly authorized by the President of Banco Santos** (believed to be a reference to Cid Ferreira), after it matured, on August 10, 2004.  See **Exhibit 23**.

148.    The payoff amount was $5,018,145.70.

149.    ESB obtained $32,758.34 in loan origination fees for the issuance and subsequent renewals of this loan.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

### VI.    Folgent Loan Number XXXX7005

150.    ESB disbursed $985,320.00 to Folgent on October 7, 2003, in the form of a loan. See **Exhibit 26**.

151.    This loan was fully cash collateralized with a certificate of deposit issued by ESB to Valence Serviços.  See **Exhibit 27**.

152.    The loan proceeds were deposited into a money market account held by Folgent with ESB.

153.    The applicable interest rate for the loan and the certificate of deposit backing up the same was identical – five (5%).

154.    On October 7, 2003, the same date the initial loan proceeds were disbursed, $978,422.76 was transferred from Folgent's money market account to a bank account held by Alsace-Lorraine, Ltd., a British Virgin Islands company beneficially owned by Cid Ferreira. See **Exhibit 26**.

155.    This loan was paid off by liquidating the collateral when it matured on October 5, 2004.

156.    The payoff amount was $1,034,996.55.

157.    ESB obtained $6,897.00 in loan origination fees for the issuance of this loan.

### VII.    Folgent Loan Number XXXX7006

158.    ESB disbursed $2,000,000.00 to Folgent on October 31, 2003, in the form of a loan. See **Exhibit 26**.

159.    This loan was fully cash collateralized with a certificate of deposit issued by ESB to Valence Serviços.  See **Exhibit 27**.

31

160.    The loan proceeds were deposited into a money market account held by Folgent with ESB.

161.    The applicable interest rate for the loan and the certificate of deposit backing up the same was identical – five percent (5%).

162.    On October 31, 2003, the same date the initial loan proceeds were disbursed, the full amount of $2,000,000.00 was transferred from Folgent's money market account to a bank account held by Alsace-Lorraine, Ltd., a British Virgin Islands company beneficially owned by Cid Ferreira.  See **Exhibit 26**.

163.    This loan was paid off by liquidating the collateral when it matured on November 5, 2004.

164.    The payoff amount was $2,101,388.89.

165.    ESB obtained $14,000.00 in loan origination fees for the issuance of this loan.

VIII.    **Folgent Loan Number XXXX7007**

166.    ESB disbursed $2,000,000.00 to Folgent on December 5, 2003, in the form of a loan.  See **Exhibit 28**.

167.    This back-to-back loan was fully cash collateralized with a certificate of deposit issued by ESB to Valence Serviços.  See **Exhibit 29**.

168.    The loan proceeds were deposited into a money market account held by Folgent with ESB.

169.    The applicable interest rate for the loan and the certificate of deposit backing up the same was identical – five percent (5%).

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

170.    On December 5, 2003, the same date that this loan was approved by ESB, Folgent transferred the full amount of $2,000,000.00 to a bank account held by Alsace-Lorraine, Ltd., a British Virgin Islands company beneficially owned by Cid Ferreira.  See **Exhibit 28**.

171.    This loan was renewed twice in December 2002 and 2003.

172.    The loan was paid off by liquidating the collateral on or about November 17, 2004 after Folgent informed ESB dated November 11, 2004, one day before the Central Bank of Brazil's intervention in Banco Santos, that it would be unable to pay this and another loan coming due in December 2004 as a result of "unexpected circumstances."  See attached **Exhibit 18**.

173.    Mr.    Lloreda instructed Sunny Casanova, a member of ESB's operations department to "cancel the [certificates of deposit] which collateralize these loans and apply proceeds to the cancellation of the loans."

174.    This loan had accrued approximately $95,068.49 in interest from the date of the second renewal.

175.    The payoff amount was approximately $2,095,068.49.

176.    ESB obtained $14,000.00 in loan origination fees for the issuance of this loan.

*Summary of the Back-to-Back Loans*

177.    A chart summarizing the details described above for each of the eight back-to-back loans is attached hereto as **Exhibit 30**.

178.    In summary, the eight back-to-back loans from ESB to Folgent and Gainex provided the structure for the diversion and laundering of more than US$38.7 million from Banco Santos for the benefit and enjoyment of Cid Ferreira and his co-conspirators.

179.    ESB's conduct evidences a pattern of mail fraud, wire fraud, bank fraud, money laundering, and monetary transactions involving property derived from unlawful activity and disbursement of the loan funds by ESB to the borrowers, Folgent and Gainex, followed by the almost immediate transfer of those funds to other accounts offshore beneficially owned or controlled by Cid Ferreira.

180.    Numerous red flags, described in additional detail in the sections that follow, are evident from a review of the documents that were produced by ESB and were known by ESB (or ESB was willfully blind to such illegality).  Moreover, ESB failed to act either by implementing normal industry safeguards and procedures, reporting the suspicious activity, or ending the banking relationship.

181.    To the contrary, ESB recommitted itself to the relationship time and again, disregarding anti-money laundering safeguards and other legal and regulatory requirements that it was legally required to implement, and allowed the scheme to continue unabated up through the time of Banco Santos' failure and intervention by the Central Bank of Brazil. Even after the intervention, ESB continued its conduct by engaging in the acts of concealment and obstruction described herein designed to prevent the Judicial Administrator from understanding the mechanisms used to defraud Banco Santos and to convert its assets.

182.    The motive for this is  that ESB obtained hundreds of thousands of dollars in loan origination and renewal fees – in transactions where it bore absolutely no risk – by facilitating and participating in the alleged scheme.  Its more recent actions were designed to protect its co-conspirators and itself.

*Angulo-Levine Confirms that the Audit Confirmation Letters Were Modified to Conceal Facts Relevant to an Auditor and the Connection Between Back-to-Back Loans and Money Laundering*

183.    The Rule 2004 examination of Ms. Angulo-Levine took place on November 2, 2012.

184.    At the time of her examination, Ms. Angulo-Levine served as Vice-President and Credit Manager at ESB.

185.    During questioning on the subject of the conflicting sets of audit confirmation letters prepared by ESB, Ms. Angulo-Levine testified that the original audit confirmation letters prepared and sent by her to PWC contained the pledge language revealing that the funds in the time deposit accounts belonging to Valence Insurance, Valence Serviços and Santos Capital had been pledged as collateral and were not "free and clear funds." In fact, these were the same funds pledged in support of the guarantees given by Valence Insurance, Valence Serviços and Santos Capital to ESB in connection with the loans to Folgent and Gainex.

186.    Ms. Angulo-Levine further testified that Mr. Medina, the person in charge of ESB's Uruguayan representative office, contacted her within a couple of weeks by phone and asked her to please "reread the audit request letter" because she had "included information in the response that was not requested."

187.    According to Ms. Angulo-Levine, Mr. Medina was referring to the pledge language and the fact that "the [time deposits] were pledged for loans."

188.    Ms. Angulo-Levine testified that Mr. Medina told her "they're not asking you to include the pledge language, so it doesn't need to be included in the audit confirmation letter."

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

189.    When asked whether the request by Mr. Medina to omit the pledge information from the reissued audit confirmation letters, thereby making it look like these assets of the Banco Santos group were not 100% encumbered struck her as odd, Ms. Angulo-Levine testified that it did not.

190.    Following Mr. Medina's request, Ms. Angulo-Levine "made a new set of letters that excluded the pledge language." Two of the new audit confirmation letters maintained the original January 22, 2004, date and one bore a February 12, 2004 date. Ms. Angulo-Levine testified that the date discrepancy was an "oversight" and not an instance of intentional back-dating.

191.    At its most benign, a request to reissue audit confirmation letters being sent to an outside auditor for three foreign entities, and to omit pledge information as to the guarantee of multiple loans worth millions of dollars, should have been major red flags for any financial institution, let alone a U.S. financial institution. However, ESB had seen multiple such red flags by 2004, and had ignored them all in its pursuit of revenue. This particular incident was no outlier and formed part of a series of ESB actions that aided and furthered the purpose of the illicit enterprise masterminded by Cid Ferreira.

192.    In addition, Ms. Angulo-Levine testified that ESB had no special controls in place during the relevant time period regarding the granting of back-to-back loans.

193.    Ms. Angulo-Levine further testified that she was aware of and knew that back-to-back loans can be and are used as a method of money laundering. Ms. Angulo-Levine offered no explanation or excuse for why or how, nor did she claim that ESB believed that the multi-million dollar Folgent and Gainex back-to-back loans were legitimate and not part of an international bank fraud and money laundering scheme.

***Mr. Lloreda Confirms that ESB Chose Time and Again to Participate, and Later, to Deepen its Participation, in the Diversion of Banco Santos's Assets***

194.    The Rule 2004 examination of Carlos Lloreda took place on January 23, 2013.

195.    Mr. Lloreda testified that he was hired initially as a credit manager for ESB in April 2000 and that he reported directly to ESB President Mr. Balestra.  As ESB credit manager, Mr. Lloreda received work from ESB lending officers and it was Mr. Lloreda's job to underwrite the proposed credit transactions forwarded by the lending officers.

196.    In addition to the proposed credit transactions coming from the lending officers, Mr. Lloreda also received proposed credit transactions from ESB's private banking department.  These proposed credit deals often involved certificate of deposit-backed loans referred to by Mr. Lloreda in his examination testimony as "basically back-to-back loans."

197.    Mr. Lloreda further testified that ESB had a steady flow of collateralized transactions where there was "no analysis" on his part because the borrower was guaranteeing the loan with one hundred percent cash collateral.

198.    A third source of proposed credit transactions came to ESB from its representative office in Montevideo, Uruguay, known at the time as Espirito Santo Oficina de Representacion.

199.    Mr. Lloreda testified that, because these proposed deals involved foreign borrowers, ESB required that the loan transactions be one hundred percent cash collateralized.

200.    Sometime in 2003, Mr. Balestra was promoted to Chairman of ESB and Mr. North was named President.  Subsequent to that, Mr. North offered Mr. Lloreda a position in ESB's private banking unit as a private banking officer.  The head of the private banking unit

at the time was Mr. Jorge Espirito Santo, a relative of the President of Banco Espirito Santo in Portugal.

201.    Upon information and belief, Mr. Balestra, a Uruguayan by birth, was instrumental in the establishment of the Uruguayan Espirito Santo Oficina de Representacion and was the reason, according to Mr. Lloreda's testimony, why the Montevideo representative office "reported to ESB in Miami."

202.    The Uruguayan Espirito Santo Oficina de Representacion was headed by Mr. Medina, a lawyer by training, and that office accounted, during the time of Mr. Lloreda's employment in the ESB private banking unit, for approximately fifty percent (50%) of ESB's private banking business by dollar amount.  Of the accounts that were sourced through Uruguay, Mr. Lloreda testified that "Banco Santos probably was the biggest."

203.    Mr. Lloreda also testified that he did not recall taking anti-money laundering courses while at ESB.

204.    Mr. Lloreda left ESB in August 2005, following a state audit that questioned many of ESB's back-to-back loan transactions and practices and ESB's unwinding of many of those questioned loan transactions in the very recent past.

205.    During Mr. Lloreda's examination, numerous ESB-produced records were introduced as exhibits and he was questioned about them.  His testimony again confirmed the role that ESB played in depriving Banco Santos of almost US$40 million.

206.    ESB produced an ESB documentation checklist for Folgent, an entity identified with customer number 10307.  The referenced documentation checklist states at the top of the document that it is "TO BE USED FOR NEW HIGH RISK PROJECT[S] ONLY."  The document, date-stamped November 9, 2004, states that the certificate of beneficial ownership

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

is "missing." See **Exhibit 31**. This particular document is date-stamped on the eve of Banco Santos' intervention by the Brazilian Central Bank and the reference to "missing" beneficial ownership documents is made more than three years into the back-to-back loan transaction dealings between ESB and Folgent.

207.    Also produced by ESB was a Know Your Customer Statement form for Folgent which names Mr. Medina as the Account Officer and Mr. North as the Reviewing Officer. The document is signed by Mr. Medina and dated 07/07/2004. See **Exhibit 32**.

208.    The 2004 Know Your Customer Statement states that "Mr. Alvaro Diez de Medina has known the partners of Doldan Amarelli [the Uruguayan law firm that created Folgent and Gainex] for over 20 years." See **Exhibit 32**.

209.    Mr. Lloreda testified that Mr. North, "[a]s the supervisor to Alvaro Diez de Medina…had to sign off saying that the form is okay, he's reviewed it.  In other words, this is proof that Mr. North has reviewed this form and it's in conformance."

210.    The "Reference Information – Method of Verification" section of the 2004 Know Your Customer Statement states simply:  "N/A."  See **Exhibit 32**.

211.    However, in an adjacent area for explaining how the client was referred, a type-written sentence states:  "This account was opened in order to facilitate several back-to-bank [sic] loans with the Banco Santos Group of Brazil."  Again this is almost three years after the inception of the back-to-back loan transactions. See **Exhibit 32**.

212.    Mr. Lloreda testified that he believed that the "back-to-bank" language in the 2004 Know Your Customer Statement for Folgent was a typographical error and that the sentence should have stated "back-to-back loans."

213.    Mr. Lloreda also gave testimony explaining the basic structure of a back-to-back loan secured by a certificate of deposit stating: "[w]hat you do is you secure a loan, a hundred percent principal, with a CD of the same amount, with a certificate of deposit. The customer will send a million dollars, let's say, will open a CD, then you agree to lend him with the collateral of that CD the same million dollars. You're lending his money back basically at an interest spread. You pay him so much on the CD and you charge him a little bit more on the loan and you make maybe one or two percent."

214.    When challenged to explain how this made any sense for the loan borrower, Mr. Lloreda testified that despite his asking, "these transactions were not explained, what the mechanism was behind it, what advantage…Those were questions that were never actually answered."

215.    In addition, when presented with documents regarding the interest rates for back-to-back loans and the CDs, both of which were five percent (5%), Mr. Lloreda testified that "the rate on the time deposits and the loans will be identical. So they're making the same amount of money on their investment in the CD that's backing the loan as they're paying on the CD. So it's a wash."

216.    Mr. Lloreda testified that these "mirror image" back-to-back loan transactions with identical CD interest rates were not typical at ESB stating, "[t]ypically when we did CD backed loans for private banking customers, we would pay them two percent on the CD and charge them three percent on the loan. We would make a spread of one percent. That was the typical way to do it, charge them more interest on the loan than on the CD. This whole business of the commission and all that stuff, this was basically structured by the law firm. The deal was worked out by the law firm in Uruguay, I would imagine, along with

[Mr. Medina] and everybody else." This preferential interest rate and treatment shows that the Folgent and Gainex loan transactions were extraordinary in this additional regard.

217.    The 2004 Know Your Customer Statement also contains other information typed into the various boxes including:

a.   "Folgent Investment SA is an Uruguayan company whose beneficial owner is Banco Santos SA."

b.   "Banco Santos contracted the law firm of Doldan Amarelli to form Folgent so as to act as the borrowing entity in several cash collateralized deals with the Banco Santos Group."

c.   "The funds running through Folgent's account arise from the loans given to Folgent and secured by the affiliated companies of the Banco Santos Group, Valence Insurance, Valence Servicos e Investimentos and Santos Capital Markets."

d.   "The back-to-back loans given to Folgent and its affiliate company, Gainex Realty SA, are part of the **fiscally advantageous strategy** that was designed by Doldan Amarelli to benefit the Banco Santos Group. The total amount of these loans exceeded $35MM. For a more in-depth analysis of this fiscal strategy please refer to the Folgent, Gainex and Banco Santos credit files." (emphasis added).

e.   "Folgent and Gainex have 8 back-to-back loans totaling $35MM."

218.    With regard to the above statements, Mr. Lloreda testified that ESB knew that Folgent was owned by Banco Santos; that the origin of the funds running through Folgent's accounts was the Banco Santos Group; that ESB did not track the borrower's [here Folgent]

41

use of the money being lent to it; that the $35MM loaned to Folgent and Gainex in 8 loans was the biggest cumulative loan transaction with a borrower (or related borrowers) at the time for ESB, which had a total bank-wide loan portfolio of approximately $200MM.

219.    These eight back-to-back loans to Folgent and Gainex represented fifteen percent (15%) of ESB's total entire loan portfolio at the time.

220.    ESB's document production to the Judicial Administrator also included a New Account Application for Folgent, and an earlier Know Your Customer Statement for the same entity from 2001.  Those documents provide, among other things:

   a.   That the account was opened with an initial deposit of $45,000, apparently received by wire transfer on October 4, 2001.

   b.   That the reviewing officer for the Know Your Customer Statement was Mr. Balestra.

   c.   That the source of funds for Folgent was Banco Santos S.A.

   d.   That Folgent was related to another ESB customer, Santos Capital Markets, Inc.

   e.   That Folgent is "a Uruguayan holding company, beneficially owned by Banco Santos of Sao Paulo – Brasil as per letter attached.  Banco Santos is well known to Espirito Santo Bank.  A complete file can be found in the Credit Dept."

221.    Mr. Lloreda testified that Mr. Victor Balestra signed the 2001 Know Your Customer Statement.

222.    A diagram of Banco Santos' ownership structure produced by ESB, and apparently, a part of its 2001 Know Your Customer Statement, showed that, as ESB knew, Banco Santos also owned Valence Insurance Co., Valence Servicos and Santos Capital

Markets, Inc. This chart, however, did not depict either Folgent or Gainex notwithstanding its evident knowledge that such companies were part of the same chain of ownership.

223. In an ESB Instruction Form dated November 22, 2004, formal instructions were given to close the Folgent account. Mr. Lloreda testified that the closing of the Folgent account was "sudden" with instructions from "the top of [the] bank" to stop working with Banco Santos.

224. Mr. Lloreda also testified that he did not know whether the decision to stop working with Banco Santos and the decision to later cease all back-to-back loan transactions at ESB were connected, but he did admit that the back-to-back loans represented "**easy money**" adding, "**[b]ut then you have to have a commercial reason for doing these things, and that's something we[, ESB,] didn't have.**"

225. When asked to elaborate, Mr. Lloreda added: "[The back-to-back loans] **arouse suspicion**. Now, of course, with a reputable entity like Banco Santos, you're not worried about money laundering, **but there could be tax evasion**. And if you extend the law, if you want to say that any crime is money laundering and tax evasion in another country is not a crime here, **but maybe we're aiding and abetting to it, maybe you can think that**." (emphasis added).

226. Mr. Lloreda was also questioned regarding two additional sets of audit confirmation letters produced by ESB on the eve of Ms. Angulo-Levine's deposition and dated in August 2004.

227. Like the audit confirmation letters authored by Ms. Angulo-Levine in January and February 2004, the August 2004 letters pertained to Valence Insurance, Valence Serviços and

Santos Capital and did not contain any reference to a pledge of these entities' CD account funds as collateral.

228.    The documents evidence that on August 12, 2004, ESB received from Valence Serviços, Valence Insurance, and Santos Capital audit confirmation requests for the six-month period that ended on June 30, 2004.  See **Exhibit 33**.  The audit confirmation requests required that ESB send its response directly to PWC.

229.    On August 13, 2004, Mr. Lloreda authored and sent to PWC in Brazil the audit confirmation letters for Valence Serviços, Valence Insurance, and Santos Capital identifying the outstanding balances of each CD held by each depositor as of June 30, 2004.  See **Exhibit 34**.  Mr. Lloreda did not include any collateral pledge information.

230.    Ms. Angulo-Levine had testified in her own examination that she had not seen the August 13, 2004 letters before her Rule 2004 Examination nor could she explain why Mr. Lloreda was authoring these as it was her job to prepare that sort of response at that time.

231.    Mr. Lloreda also testified that he could not explain why he had authored the August 13, 2004 audit confirmation letters sent to PWC, since it was no longer his job to prepare and issue that type of letter.

232.    On August 12, 2004, ESB also received from Valence Serviços, Valence Insurance, and Santos Capital a second set of audit confirmation requests for the six-month period that ended on June 30, 2004.  See **Exhibit 35**.  These audit confirmation requests required that ESB send its response directly to Trevisan/Grant Thornton ("Grant Thornton") in Brazil.

233.    The language of these audit confirmation requests was broader in scope than the request for letters to be sent to PWC as it requested information regarding the interest agreed, issue dates, due dates, contract numbers and current amounts for all "open transactions."

234.    On August 13, 2004, Mr. Lloreda authored and sent to Grant Thornton in Brazil the audit confirmation letters for Valence Serviços, Valence Insurance, and Santos Capital identifying the outstanding balances of each CD held by each depositor as of June 30, 2004. See Exhibit 36. Mr. Lloreda's responses to Grant Thornton were identical to the responses he sent to PWC, in that they also failed to disclose the key collateral pledge information for the CD accounts.

235.    When Mr. Lloreda was presented with the August 12, 2004 audit confirmation letters that he authored and sent to both PWC and Grant Thornton, he testified that his instinct would have been to disclose the full picture, meaning that the CD balances were pledged as collateral for the Folgent and Gainex back-to-back loans.

236.    Moreover, Mr. Lloreda acknowledged that the audit confirmation requests from Grant Thornton were broader in scope and that the back-to-back loans should have been disclosed because the requests included language requiring the disclosure of "open transactions" and this request covered both assets and liabilities.

237.    Mr. Lloreda could not articulate why he had failed to disclose that the CDs were fully pledged as collateral for the back-to-back loans issued to both Folgent and Gainex in his letters to Grant Thornton.

238.    As noted supra at paragraphs 126 to 145, Folgent defaulted on two loans that became due in June 2004. ESB agreed to a thirty (30) day extension of the loan maturity dates. ESB similarly extended the maturity dates for the corresponding CDs.

239.   Folgent defaulted again as evidenced by the cancellation of these two loans on August 10, 2004 using the collateral from the CDs. In fact, the President of Banco Santos himself (believed to be a reference to Cid Ferreira) approved the application of the corresponding collateral to cancel these loans on August 10, 2004.

240.   In light of Mr. Lloreda's knowledge of the June and July 2004 defaults and the original stated source of repayment for the loans (the CDs), his failure to identify that the CDs were pledged as collateral for the loans issued to Folgent and Gainex was fraudulent.

241.   During his deposition, Mr. Lloreda was also questioned about a memorandum produced by ESB and authored by Mr. Balestra after an October 30, 2003 telephone conference between himself, Mr. Medina and Mr. Martinelli. See **Exhibit 37**.

242.   According to Mr. Balestra's memorandum to the Folgent and Gainex files, copying Mr. Medina and sent to Mr. Lloreda:

> On October 30, 2003 Alvaro Diez de Medina and I had a lengthy telephone conversation with Mario Arcangelo Martinelli, Managing Director of Banco Santos, S.A. The purpose of this conference was to learn more about the purpose of the back to back loans made to Gainex Realty and Folgent Investment, S.A. at the request of Banco Santos. We have documentation on file certifying that both Gainex and Folgent are beneficially owned by Banco Santos. We also have on file a statement of purpose from the two borrowers certifying that proceeds of the loans are used to invest in Bank of Europe (an offshore bank also part of the Banco Santos Group). Mr. Martinelli explained that Banco Santos is an active participant in the programs offered by BNDS (Brazilian Development Bank) to the corporate sector. He said that when companies (which are clients of Banco Santos) borrow funds through these programs, part of these funds are kept in the form of short term investments until the time that they have to be used to fund projects. In order to better remunerate such investments, the Banco Santos group accepts the funds at one of their affiliates, namely Santos Capital Markets, or Valence Serviços e Investimentos. If these entities were to redeposit the funds directly with Banco Santos, the withholding tax would be extremely high (34%). Rather, the takers deposit the funds with Espirito Santo Bank and pledge the funds as collateral for loans made by Espirito Santo Bank to the above referenced borrowers. In turn these entities use the proceeds of the loans to deposit with Bank of Europe which in turn places them with Banco Santos.

243.     This explanation evidences a clear and indisputable intention to structure these loans for an illicit purpose and was at odds with earlier loan purpose descriptions recorded by ESB in its papers.   Even with this explanation, ESB decided to continue the banking relationship and to deepen it with additional loans and maturity extensions to Folgent and Gainex after the date of this particular memorandum.

244.     When questioned about this particular document, Mr. Lloreda testified that the purpose of the Bank of Europe transactions was "to circumvent the withholding tax in Brazil."

245.     ESB also produced an email dated November 3, 2004, forwarded by Mr. Lloreda to his assistant concerning the closing of the Folgent and Gainex accounts in December 2004. The email sent to Mr. Lloreda from Mr. Medina's office in Uruguay and copying high ranking ESB personnel including Jorge Espirito Santo, Mr. North, and Daisy Castro who worked with Mr. North, suggests that the accounts were being closed after an effort to "re-document" the accounts, but that the efforts had failed because of the costs associated with doing that for the borrowers and Banco Santos.  See **Exhibit 11** at pages 8-9 thereto.

246.     In that same email chain, Mr. Lloreda states that the closing is to take place "when the accounts are paid off in full" and adds that, "[i]n lieu of a KYC, a memo to the file regarding their purpose and relation to Banco Santos will be done.  A full KYC is not merited."  See **Exhibit 11** at pages 8-9 thereto.

247.     When asked what that email exchange meant in the context of the earlier Know Your Customer Statements from 2001 and 2004, Mr. Lloreda states that he is unsure whether KYCs **"were done after the fact"**, (emphasis added), concluding instead that his statement

may have been sent to an ESB compliance officer and may have been connected to a state audit looking into the ESB back-to-back loan transactions.

248.    ESB's documents show that the credit applications for the Folgent and Gainex loans indicate from the start that the source of expected payment was going to be "liquidation of collateral." Mr. Lloreda explained that ESB did not have the benefit of an actual credit analysis for the borrowers. He explained that Valence Insurance, Valence Serviços and Santos Capital Markets were "**shell holding companies**." He added that he knew of **no business or cash flow generation on their part and he testified that they were basically "pass-throughs" for money that came from Banco Santos**.

249.    In a credit approval request from June 2004, the terms for renewal changed. A handwritten note at the bottom of the document references a meeting between Ricardo Espirito Santo and Mr. Martinelli of Banco Santos. An email from Mr. North on June 23, 2004, describes the meeting between Ricardo Espirito Santo and the President of Banco Santos, stating that Ricardo Espirito Santo "explained our revised policy toward this type of business in view of our size, profitability of these transactions, **compliance issues, etc.** and indicated we would be counting on the payment of the transactions as they come due." (emphasis added). Even at that point, ESB continued banking on both sides of the back-to-back loan transactions.

### ESB Ignored a Number of Obvious Anti-Money Laundering Red Flags and then Facilitated the Money Laundering Scheme In Its Pursuit of "Easy Money"

250.    A scheme of the magnitude and character alleged herein was made possible only by the purposeful and knowing involvement of the financial institution hosting the key money laundering accounts, in this case, ESB. It was only with ESB's substantial and

sustained assistance that Cid Ferreira and his co-conspirators were able to launder the millions of dollars diverted from Banco Santos for their own personal use and enjoyment.

251.     ESB's actions over the course of more than a three year period between 2001 and 2004 constituted a flagrant disregard and violation of several anti-money laundering laws.

252.     The Currency and Foreign Transactions Reporting Act, also known as the Bank Secrecy Act (31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1829(b), and 1951-1959, the "BSA"), and its implementing regulation (31 C.F.R. 103), were enacted to prevent banks and other financial service providers from being used as intermediaries for, or to hide the transfer or deposit of money derived from, criminal activity.

253.     Since its passage in 1970, Congress has amended the BSA a number of times to enhance its effectiveness, including in the aftermath of the September 11, 2001 terrorist attacks in the United States.  However, even before the 2001 enhancements to the BSA, more than 170 crimes were listed in the money laundering statutes then in force.  The laws applicable to the subject transactions required financial institutions to educate their employees, to understand their customers and their businesses, and to have systems and procedures in place to distinguish routine transactions from ones that rose to the level of suspicious or illegal activity.

254.     Among other things, the BSA and related regulations promulgated by the relevant bank regulators required banks to develop, administer, and maintain a program that ensured and monitored compliance with the BSA and its implementing regulations, including record keeping and reporting requirements.

255.     In addition, an effective compliance program during the relevant time period described here should have included controls and measures to identify and timely report

suspicious transactions. A financial institution was required to employ due diligence to be able to make an informed decision about the suspicious nature of a particular transaction and whether to file a suspicious activity report.

256.    For example, in its September 2000 Comptroller's BSA/Anti-Money Laundering Handbook, the Office of Currency Comptroller ("OCC"), an independent bureau with the U.S. Department of Treasury described money laundering as follows:

> Money laundering is the criminal practice of filtering ill-gotten gains or "dirty" money through a maze or series of transactions, so the funds are "cleaned" to look like proceeds from legal activities. Money laundering does not have to involve cash at every stage of the laundering process. Any transaction conducted with a bank might constitute money laundering. Although money laundering is a diverse and often complex process, it basically involves three independent steps that can occur simultaneously:
>
> • Placement: The process of placing, through deposits or other means, unlawful cash proceeds into traditional financial institutions.
>
> • Layering: The process of separating the proceeds of criminal activity from their origin through the use of layers of complex financial transactions, such as converting cash into traveler's checks, money orders, wire transfers, letters of credit, stocks, bonds, or purchasing valuable assets, such as art or jewelry.
>
> • Integration: The process of using an apparently legitimate transaction to disguise the illicit proceeds, allowing the laundered funds to be disbursed back to the criminal. Different types of financial transactions, such as sham loans or false import/export invoices, can be used.

257.    This case features classic money laundering activity through the use of eight back-to-back loans. The facts described herein also reveal multiple instances of placement, layering and integration as described in the OCC Handbook.

258.    In addition, the OCC Handbook provides guidance for banks to use when opening business accounts. Included are instructions to:

> • Determine who are the beneficial owners of all accounts in private banking, trust, and other specialized banking departments. The bank should pay particular attention to corporate entities, international business

corporations, bearer share companies, or nominee officers, especially if such organizations are based in countries or jurisdictions considered to be secrecy or money laundering havens.

- Consider the source of funds used to open the account. Large deposits, especially cash, should be questioned.

259.    ESB failed to carry out these steps or any proper account opening procedures from the outset of the banking relationship with Folgent and Gainex.  Indeed, the records and information that were collected and which do exist are contradictory, if not false.

260.    For example, ESB collected a United States W-8BEN Certificate of Foreign Status of Beneficial Owner for United States Tax Withholding form for Folgent at the inception of the banking relationship in 2001.  See attached **Exhibit 38**.  In that form, Folgent is represented to be a Uruguayan incorporated entity with a Montevideo, Uruguay address.  Further, the beneficial owner is represented to be "**a resident of URUGUAY** within the meaning of the income tax treaty between the United States and that country." (emphasis added).  However, in the accompanying Know Your Customer Statement form, handwritten comments describing Folgent state, "Folgent S.A. is a Uruguay holding company, **beneficially owned by Banco Santos of Sao Paulo – Brasil**." See attached **Exhibit 11**, (emphasis added).

261.    Upon information and belief, the ultimate beneficial owner of Folgent and Gainex, was Cid Ferreira, and this fact was known to ESB, making each of the foregoing statements false.

262.    The failure to obtain and maintain records identifying Cid Ferreira as the ultimate beneficial owner of Folgent and Gainex was only part of the participation, aiding and assistance that ESB was willing to provide him and his co-conspirators.  The bulk of the participation, aiding and assistance given by ESB was in establishing a mechanism for back-

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

to-back loan transactions used to launder money diverted from Banco Santos in Miami and used, ultimately, to transfer laundered funds onward to offshore bank accounts in a known money laundering haven controlled by Cid Ferreira and his co-conspirators so that they could cash out and enjoy the fruits of their illicit activities.

263.    These activities were violative of obligations applicable to the operation of ESB in Florida pursuant to, among others things, the BSA, Chapter 655 of the Florida Statutes, and of applicable Federal Deposit Insurance Corporation regulations.

264.    For example, it was part of ESB's duties to verify the source of funds used to collateralize the Folgent and Gainex loans.  ESB conducted no such verification.  ESB's production of documents proves this as it is devoid of any evidence of efforts by ESB to verify the source of funds.  Mr. Lloreda's testimony also confirms this fact.

265.    ESB also ignored an extensive number of industry-recognized "red-flags" that should have triggered investigation, reporting and the cessation of the banking relationships with Folgent and Gainex.

266.    The September 2000 Comptroller's Handbook compiled by the OCC provides an extensive list of "potentially suspicious activities that should raise red flags for further investigation to determine whether the transactions or activities reflect illicit activities rather than legitimate business activities and whether a SAR should be filed."  These suspicious activities include:

- **"A business account history that shows little or no regular, periodic activity; the account appears to be used primarily as a temporary repository for funds that are transferred abroad."**  Folgent loan accounts showed little or no regular, periodic activity.  Instead these one hundred percent cash collateralized loan accounts were used

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

as a pretext to transfer funds diverted from Banco Santos to Miami as collateral. Then, immediately after the loan funds were disbursed following receipt of the collateral, the loan funds were transferred to offshore accounts beneficially owned by Cid Ferreira and his family outside of the United States.

• **"A customer's place of business or residence is outside the financial institution's service area."** Folgent and Gainex were Uruguayan bearer share companies without any business presence or activity in Miami, Florida. The ESB representative office in Uruguay, which was supervised by ESB in Miami, sourced the business and worked in conjunction with ESB in Miami to open the back-to-back loan accounts. ESB knew that the ultimate source of funds was Banco Santos in Brazil and that it was not resident in or doing business in Miami or Uruguay. The same was true for the three entities pledging the funds that served as collateral.

• **"Unusual transfer of funds among related accounts or accounts that involve the same principal or related principals."** ESB knew that the cash to collateralize the back-to-back loans made to Folgent and Gainex originated from funds of Banco Santos and related entities all controlled and/or beneficially owned by Cid Ferreira and that the loan funds were subsequently transferred to offshore entities also controlled and/or beneficially owned by Cid Ferreira and his family, not Banco Santos.

• **"Wire transfer activity to/from financial secrecy haven countries without an apparent business reason or when it is inconsistent with the customer's business or history."** Folgent and Gainex are bearer shares companies formed in a financial secrecy haven – Uruguay. Mr. Lloreda testified that ESB knew that they were "shell companies" without an apparent business reason. The subsequent transfer of the loan funds out of

ESB in Miami was also to entities located in other offshore secrecy havens with no history of legitimate business activities.

• **"Funds transferred in and out of an account on the same day or within a relatively short period of time."** Receipt of the funds used to collateralize the Folgent and Gainex loan accounts allowed for the almost-immediate transfer of the corresponding ESB loan funds, to other offshore accounts beneficially owned by Cid Ferreira and his family outside of the United States.

• **"Regular deposits or withdrawals of large amounts of cash, using wire transfers to, from, or through countries … whose laws are ineffective in controlling the laundering of money."** The loan funds available to Folgent and Gainex as a result of the back-to-back loan transactions were transferred by wire out of ESB to Alsace-Lorrain and the Bank of Europe in Antigua and Barbuda, a jurisdiction with a history of "blacklisting" by U.S. regulators on account of weak banking and anti-money laundering regulations and controls.

• **"Unusual or suspicious identification documents that the financial institution cannot readily verify."** Folgent's loan accounts at ESB were opened using the alleged Uruguayan identification documents for a seventy-two year old "journalist" named Alex Pereyra Formoso without any explanation of how or why a Uruguayan journalist was involved in the opening of these accounts while ESB knew that Folgent was beneficially owned and controlled by Cid Ferreira. The same was true for the Gainex account which was opened using Uruguayan identification papers, including the identification for one of the lawyers at the Doldan Amarelli law firm.

- **"Certificate(s) of deposit or other investment vehicle used as loan collateral."** This was the exact purpose for the cash collateral pledged for the Folgent and Gainex back-to-back loans.

- **"Offshore companies, especially those located in bank secrecy haven countries, asking for a loan from a domestic U.S. bank, or for a loan secured by obligations of offshore banks."** Folgent and Gainex were Uruguay bearer shares companies that asked a U.S. Bank, ESB, for multiple multi-million dollar back-to-back loans secured by cash collateral from different non-U.S. companies.

267.    Had ESB complied with applicable banking regulations, it would have monitored, logged and reported the above-cited irregularities and would have ceased providing the key and substantial assistance crucial to the enterprise's successful scheme.

268.    Cid Ferreira and his co-conspirators were aware of these rules, and, therefore, could not have carried out their scheme without the participation and substantial assistance of a financial institution willing to disregard them.  In return for "easy money" in the form of fees and interest charges, ESB was such a willing partner.

***ESB Acted with Knowledge***

269.    ESB and its co-conspirators conducted this racketeering activity through a pattern of predicate acts that began in the fall of 2001, and went on for years.  The predicate acts all had the common purpose of diverting funds from Banco Santos out of Brazil, laundering those funds in Miami through the use of back-to-back loans from ESB, and onward transferring of the laundered funds to accounts controlled by Cid Ferreira in offshore jurisdictions.  ESB's and its co-conspirators' conduct thereafter constituted a continuing and

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

concerted effort to obfuscate the whereabouts of the ill-gotten assets and to prevent the detection and uncovering of its involvement and extent of its role in the scheme.

270.    ESB's agents, including but not limited to, Mr. Balestra, Mr. North, and Mr. Medina, knew that the back-to-back loans did not have a commercial purpose and that the funds pledged as collateral originated from Banco Santos' funds.  ESB's agents, as set forth herein, also knew that the back-to-back loans, one of the most traditional and widely used money laundering techniques, were used to divert funds from Banco Santos.   These and other agents of ESB also and, in the alternative, deliberately shielded themselves from clear evidence of critical facts (the diversion of Banco Santos' funds through the back-to-back structure) that strongly suggested, if not established, the illegality that is the subject hereof, based on the circumstances surrounding the issuance and renewal of the back-to-back loans, the foreclosure of the collateral, and the destination of the loan proceeds.   In other words, ESB's agents were wilfully blind or consciously avoided learning about critical facts surrounding the fraud relating to the diversion of Banco Santos' funds such that they can be charged with actual knowledge of those critical facts.

271.    A number of key facts confirm that ESB acted with knowledge of the underlying fraud and conversion and that ESB intentionally acted in furtherance of the scheme and cover-up, a small example of which intentional acts include:

    a.    The issuance and use of back-to-back loans amounting to millions of Dollars and constituting approximately fifteen percent (15%) of ESB's total loan portfolio;

    b.    Lending millions of Dollars to Uruguayan bearer-share entities with conflicting and inadequate beneficial ownership information;

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

c.  Ignoring corporate ownership information available both in ESB's own files and publicly while issuing loans guaranteed by entities owned and/or controlled by the same ultimate beneficial owner and known to be "shells" with no business or cash flow;

d.  Accepting collateral known to be ultimately owned by Banco Santos (the biggest private banking client sourced by ESB in Uruguay) for the purpose of extending loans to entities owned and/or controlled by its ultimate beneficial owner to its exclusion;

e.  Using collateral known to be ultimately owned by Banco Santos for the anticipated and pre-determined purpose of cancelling the loans extended to parties owned and/or controlled by the same beneficial owner, again, to the exclusion of Banco Santos;

f.  Ignoring conflicting or non-existent business purposes for the loans;

g.  Engaging in transactions with no interest spread and no risk to ESB, thereby granting preferred and exceptional treatment to the entities benefiting therefrom;

h.  Engaging in transactions which "aroused suspicion" and were known to facilitate tax evasion;

i.  Earning hundreds of thousands of Dollars in loan origination and renewal fees;

j.  Issuing inconsistent and fraudulent audit confirmation letters to two different independent auditors on more than one occasion, including, in one instance, after defaults by the borrowers on the back-to-back loans that triggered an immediate right to recovery under the undisclosed pledge agreements;

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

k.  Misrepresenting the existence of US$38.7 million in assets in the audit letters that ESB knew were illusory due to their status as collateral and as the only source of repayment for the back-to-back loans issued to Folgent and Gainex; and

l.  Making inconsistent and false representations regarding the existence, status and significance of audit confirmation letters described by ESB in one communication as potentially "fraudulent" in an effort to, among other things, conceal or prevent the discovery of ESB's actions and role in the scheme.

### CAUSES OF ACTION

### COUNT I – RICO (Violation of 18 U.S.C. § 1962(c)

272.  The Judicial Administrator incorporates paragraphs 1 through 271 above by reference.

273.  ESB is a bank incorporated in Florida and engaged in, and whose activities affect, interstate commerce.  At all times relevant, ESB was employed by or associated with the enterprise described above.

274.  ESB agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally diverting, laundering and converting millions of dollars belonging to Banco Santos.

275.  Pursuant to and in furtherance of the illegal scheme, ESB knowingly agreed to perform acts, and did perform multiple related acts of mail, wire and bank fraud, money laundering and monetary transactions in property derived from specified unlawful activity all of which facilitated the activities and conduct of those operating and managing the enterprise in an illegal manner, including but not limited to, Folgent, Gainex, Valence Insurance, Valence Serviços, Santos Capital, Cid Ferreira, Silva and Martinelli.

276.   The acts of mail, wire and bank fraud, money laundering and monetary transactions in property derived from specified unlawful activity set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

277.   ESB directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering described above in violation of 18 U.S.C. § 1962(c).

278.   As a direct and proximate result of ESB's racketeering activities and violations of 18 U.S.C. § 1962(c), Banco Santos was injured in its business and property through the loss of more than US$38.7 million.

WHEREFORE, the Judicial Administrator requests a judgment against ESB awarding treble damages of US$116.1 million, plus interest, costs and attorneys' fees, and for such further relief as the Court deems just and proper.

## COUNT II – RICO (Violation of 18 U.S.C. § 1962(d)

279.   The Judicial Administrator incorporates paragraphs 1 through 271 above by reference.

280.   ESB is a bank incorporated in Florida and engaged in, and whose activities affect, interstate commerce.  At all times relevant, ESB was employed by or associated with the enterprise described above.

281.   ESB agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally diverting, laundering and converting millions of dollars belonging to Banco Santos.

282.   Pursuant to and in furtherance of the illegal scheme, ESB knowingly agreed to perform acts, and did perform multiple related acts of mail, wire and bank fraud, money

laundering and monetary transactions in property derived from specified unlawful activity all of which facilitated the activities and conduct of those operating and managing the enterprise in an illegal manner, including but not limited to, Folgent, Gainex, Valence Insurance, Valence Serviços, Santos Capital, Cid Ferreira, Silva and Martinelli.

283.    The acts of mail, wire and bank fraud, money laundering and monetary transactions in property derived from specified unlawful activity, set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

284.    ESB directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering described above in violation of 18 U.S.C. § 1962(c).

285.    As a direct and proximate result of ESB's racketeering activities and violations of 18 U.S.C. § 1962(c), Banco Santos was injured in its business and property through the loss of more than US$38.7 million.

286.    As set forth above, ESB agreed and conspired to violate 18 U.S.C. § 1962(c).

287.    Specifically, ESB conspired to conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally diverting, laundering and converting millions of dollars belonging to Banco Santos.

288.    ESB knew that its predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the scheme described above and to enrich itself.

289.    That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

290.    As a direct and proximate result of ESB's conspiracy with the members of the enterprise, the overt acts of mail, wire and bank fraud, money laundering and monetary transactions in property derived from specified unlawful activity taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Banco Santos was injured in its business and property through the loss of more than US$38.7 million.

WHEREFORE, the Judicial Administrator requests a judgment against ESB awarding treble damages of US$116.1 million, plus interest, costs and attorneys' fees, and for such further relief as the Court deems just and proper.

## COUNT III (AIDING AND ABETTING FRAUD)

291.    The Judicial Administrator incorporates paragraphs 1 through 271 above by reference.

292.    Folgent, Gainex, Valence Insurance, Valence Serviços, Santos Capital, Cid Ferreira, Silva and Martinelli committed a fraud against Banco Santos.

293.    As described throughout this Complaint, ESB had actual knowledge of the fraud that was being perpetrated on Banco Santos by the above-named persons and entities.

294.    ESB knowingly and intentionally provided substantial assistance and facilitated numerous overt acts of mail, wire and bank fraud, money laundering, and monetary transactions involving property derived from unlawful activity, most significantly, but not limited to, the above-described back-to-back loan transactions that allowed the conspirators to launder millions of dollars belonging to Banco Santos.

295.    Without ESB's substantial participation, assistance, and aid, the conspirators would not have been able to fraudulently launder US$38.7 million converted from Banco

Santos and would not have been able to fraudulently transfer the laundered funds to offshore accounts controlled by Cid Ferreira.

296.    As a result of the above-described fraud, Banco Santos has sustained losses in excess of US$38.7 million.

297.    The wrongful acts of ESB in this regard were done with malice and with the intent to defraud.

298.    Banco Santos is entitled to punitive and exemplary damages in an amount to be ascertained at trial.

WHEREFORE, the Judicial Administrator requests a judgment against ESB awarding compensatory, and punitive damages, interest, costs and attorneys' fees, and for such further relief as the Court deems just and proper.

### COUNT IV (CONSPIRACY TO DEFRAUD)

299.    The Judicial Administrator incorporates paragraphs 1 through 271 above by reference.

300.    ESB, Folgent, Gainex, Valence Insurance, Valence Serviços, Santos Capital, Cid Ferreira, Silva and Martinelli engaged in a civil conspiracy to defraud Banco Santos.

301.    The fraudulent conspiracy included an agreement to commit several unlawful acts, including agreements to engage in mail, wire and bank fraud, money laundering, and engaging in monetary transactions involving property derived from specified unlawful activity, primarily through the use of ESB's bank accounts.

302.    ESB, Folgent, Gainex, Valence Insurance, Valence Serviços, Santos Capital, Cid Ferreira, Silva and Martinelli engaged in numerous overt acts through mail, wire and bank fraud, money laundering, and monetary transactions involving property derived from

specified unlawful activity, most significantly, but not limited to, the above-described back-to-back loan transactions which allowed the conspirators to launder millions of dollars diverted from Banco Santos.

303.    As a direct and proximate result of the conspiracy, Banco Santos has been damaged.

304.    The wrongful acts of ESB in this regard were done with malice and with the intent to defraud.

305.    Banco Santos is entitled to punitive and exemplary damages in an amount to be ascertained at trial.

WHEREFORE, the Judicial Administrator requests a judgment against ESB awarding compensatory and punitive damages, interest, costs and attorneys' fees, and for such further relief as the Court deems just and proper.

## COUNT V (VIOLATION OF ARTICLE 186 OF THE BRAZILIAN CIVIL CODE)

306.    The Judicial Administrator incorporates paragraphs 1 through 271 above by reference.

307.    Under Article 186 of the Brazilian Civil Code, it is an illicit act to violate the rights of and cause harm to another by an intentional, reckless or negligent act or omission.

308.    Folgent, Gainex, Valence Insurance, Valence Serviços, Santos Capital, Cid Ferreira, Silva and Martinelli violated the rights of and caused harm in the amount of US$38.7 million to Banco Santos and its creditors.

309.    ESB either knew or consciously avoided or was willfully blind to the wrongful acts committed by the above-named persons and entities to the detriment of Banco Santos.

ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.

310.    ESB either knowingly, recklessly or negligently provided substantial assistance to and facilitated numerous overt acts of mail, wire and bank fraud, money laundering, and monetary transactions involving property derived from unlawful activity.

311.    ESB either knowingly, recklessly or negligently ignored numerous red flags and failed to follow adequate "know your customer" procedures.

312.    As a direct and proximate result of ESB's intentional, reckless or negligent acts and omissions, Banco Santos and its creditors have sustained losses in excess of US$38.7 million.

WHEREFORE, the Judicial Administrator requests a judgment against ESB awarding compensatory and punitive damages, interest, costs and attorneys' fees, and for such further relief as the Court deems just and proper.

## COUNT VI (VIOLATION OF BRAZILIAN LAW NO. 9.078)

313.    The Judicial Administrator incorporates paragraphs 1 through 271 above by reference.

314.    Banco Santos' depositors and creditors are consumers pursuant to Brazil's Consumer Protection and Defense Act (Law No. 9.078 of November 11, 1990, the "Consumer Protection Act")

315.    Article 14 of the Consumer Protection Act provides that a service provider is liable, regardless of fault, for harm caused to consumers by defects relating to the rendition of services as well as for providing insufficient or inadequate information about its use and risks.

316.    ESB provided its financial services to Banco Santos and other entities affiliated to Banco Santos and, by extension, to the depositors and creditors of Banco Santos pursuant to Brazilian insolvency law.

Astigarraga Davis Mullins & Grossman, P.A.

317.    ESB's services caused Banco Santos and its stakeholders, including the depositors and creditors, to sustain losses in excess of US$38.7 million.

WHEREFORE, the Judicial Administrator requests a judgment against FSB awarding compensatory and punitive damages, interest, costs and attorneys' fees, and for such further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Mr. Aguiar, as duly appointed Judicial Administrator for the Banco Santos Estate requests a jury trial on any and all counts for which a trial by jury is permitted by law.

Dated this 20th day of December, 2013.

Respectfully submitted,

ASTIGARRAGA DAVIS
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Tel:    (305) 372-8282
Fax:    (305) 372-8202
E-mail:edavis@astidavis.com

 /s/ Edward H. Davis, Jr.
EDWARD H. DAVIS, JR.
Fla. Bar No. 704539
ANNETTE C. ESCOBAR
Fla. Bar No. 0369380
ARNOLDO B. LACAYO
Fla. Bar No. 675482
RODRIGO S. DA SILVA
Fla. Bar No. 88600

*Counsel for Plaintiff, Vânio Cesar Pickler Aguiar,*
*As Judicial Administrator for the Banco Santos,*
*S.A. et al, Estate*