

**ORDERED in the Southern District of Florida on October 31, 2014.**

Laurel M. Isicoff, Judge
United States Bankruptcy Court

Tagged Opinion

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA

In re:                                              Case No.  10-47543-BKC-LMI

BANCO SANTOS, S.A.,

Debtor in Foreign Proceeding.                       Chapter 15
_____/

VÂNIO CESAR PICKLER AGUIAR,                          ADV. CASE NO. 13-1934-BKC-LMI
Trustee,

            Plaintiff,

vs.

ESPIRITO SANTO BANK,

            Defendant.
_____/

### MEMORANDUM OPINION ON DEFENDANT'S MOTION TO DISQUALIFY

This matter came before me for evidentiary hearing on March 5th and March 11th, 2014,

on Defendant Espirito Santo Bank's Amended Motion for Disqualification of Astigarraga, Davis,

Mullins & Grossman, P.A. as counsel for Plaintiff Trustee—Vânio Cesar Pickler Aguiar (ECF #

79) (the "Amended Motion"). After reviewing the Amended Motion and all pleadings filed in connection therewith, and consideration of all of the evidence, case law, statutes, and regulations, I entered an oral ruling on April 21, 2014.[1] This Memorandum Opinion memorializes that oral ruling and includes the factual background that was not necessary to include in the oral ruling.[2]

## Summary of Relevant Facts

**Overview of Case**

Plaintiff Trustee, Vânio Cesar Pickler Aguiar ("Aguiar") was appointed Judicial Administrator of Banco Santos S.A. ("Banco Santos") on September 20, 2005 by the 2nd Bankruptcy and Judicial Reorganization Court of Sao Paulo, Brazil (the "Brazil Bankruptcy Proceeding").  Banco Santos was forced into a Brazilian bankruptcy proceeding in 2005 following a series of financial losses, precipitated at least in part by misappropriation of assets by the former head of Banco Santos, Edemar Cid Ferreira, as well as various Banco Santos employees. A criminal case was held in Brazil resulting in Ferreira's conviction for money laundering, among other crimes.

On December 9, 2010, Aguiar filed a Chapter 15 petition for recognition of the Brazil Bankruptcy Proceeding[3] as a foreign main proceeding. I granted the petition for recognition.[4] One of the primary purposes of the Chapter 15 proceeding was to investigate the transfer of Banco Santos assets in and through the United States, to identify potential litigation targets, and, if appropriate, bring actions arising from the results of that investigation.  In order to preserve the integrity of the investigative process, and avoid the possible further concealment of

---

[1] The Oral Ruling appears at ECF #164.
[2] The following are my findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  To the extent it is determined that I did not have jurisdiction to finally resolve this dispute, the following constitute my proposed findings of fact and conclusions of law pursuant to 28 U.S.C. §157(c)(1). However, no party has challenged my jurisdiction to enter a final order on this matter.
[3] Case No. 10-47543-BKC-LMI, ECF #1.
[4] Case No. 10-47543-BKC-LMI, ECF #9.

misappropriated Banco Santos assets, all discovery was issued under seal and subject to confidentiality requirements. At all times, including with respect to all matters relevant to the Disqualification Motion, Aguiar has been represented by the law firm Astigarraga, Davis, Mullins & Grossman, P.A. ("AD").

One of the financial institutions Aguiar served with discovery requests was Espirito Santo Bank ("ESB").  Just over three years after the Trustee sought Chapter 15 recognition, on December 20, 2013, the Trustee brought this adversary proceeding against ESB.[5] In the complaint, Aguiar asserts that due to wrongful acts of ESB, Banco Santos lost $38.7 million.

**Discovery Disputes**

The Disqualification Motion arises from the discovery sought by Aguiar prior to his lawsuit against ESB.  Initially, Aguiar served ESB with a sealed subpoena in August 2011. For approximately one year, Aguiar dealt directly with ESB and with attorney Robert Stewart of Robert W. Stewart, P.A. During that time, Aguiar requested production of audit confirmation letters issued by ESB in connection with three entities related to Banco Santos. While originally ESB reported that it could not locate the audit letters, it eventually produced them in April 2012. Because of alleged discrepancies in the letters, Aguiar requested an affidavit of a senior vice-president and credit manager at ESB, Margarita Angulo-Levine. Eventually, in September 2012, ESB informed Aguiar that he should proceed with a subpoena for deposition in lieu of preparing an affidavit for Angulo-Levine. ESB then retained the law firm of Tabas, Freedman & Soloff, P.A.[6] ("TF") to represent it in the discovery process.

---

[5] Defendant ESB is a subsidiary of the Portuguese bank, Banco Espirito Santo.
[6] At the time hired by ESB, the firm's name was Tabas, Freedman, Soloff, Miller, & Brown.

On November 2, 2012, AD conducted a Rule 2004 examination of Angulo-Levine. During Angulo Levine's examination, after questioning her about certain "back-to-back" loans,[7] AD asked with regard to Banco Santos related transactions whether ESB was "at any point officially criticized by any regulators with regard to these back-to-back loans?"[8] After Angulo-Levine said she did not recall, AD asked whether ESB was "put under a cease and desist or [a memorandum of understanding], or any other form of criticism, by a regulator with regard to any aspect of its business." Angulo-Levine responded that she did not think she could answer the question because she believed the answer was privileged. At this point, there was an off-the-record discussion between Gary Freedman of TF, the partner representing ESB at the 2004 examination, and Edward Davis of AD, the partner representing Aguiar at the 2004 examination, regarding the question. After going back on the record, Angulo-Levine did not respond to the question. Freedman then assured Davis that he would consult with someone, presumably at ESB, who could determine the privileged nature of the question.

Following the Angulo-Levine examination, attorneys at AD and TF had further communication regarding exactly what privilege ESB was asserting. On November 16, 2012, Rodrigo Da Silva of AD asked Freedman in an e-mail, "Have you been able to confer with your client to ascertain whether there is anything privileged … " Freedman responded that he would check and that he did "not think that testimony was that whatever is confidential necessarily related to back-to-back loans." Da Silva replied, "I agree that it may not be limited to the back-

---

[7] "Back-to-back" loans are loans in which two parties, in different countries, lend money to each other. One purpose for these loans is to hedge against currency fluctuation. Normally, there is a fixed term for repayment of around a year. For example, one company might be in Brazil and another in the U.S. The Brazilian company would lend Brazilian reals for the same value of U.S. Dollars from the U.S. company. A year later, there would be repayment. *Definition of 'Back-to-Back Loan'*, INVESTOPEDIA, http://www.investopedia.com/terms/b/backtobackloan.asp (last visited October 27, 2014).
[8] One of Aguiar's contentions in his complaint against ESB is that "back-to-back" loans were utilized to fraudulently siphon funds from Banco Santos.

to-back loans. The theme appears to be your client's [Know Your Customer] procedures and there may be a focus on back-to-back loans."

After numerous telephone and e-mail conversations, on November 30, 2012, Freedman sent Davis a letter (the "November 30 Letter") contending that the information sought from Angulo-Levine was protected by "the banking examination privilege, 12 C.F.R. §309.6 and Florida Statute §655.057." Moreover, ESB insisted that such information would need to be retrieved directly from a regulator, such as the Florida Office of Financial Regulation (OFR) or the Federal Deposit Insurance Company (FDIC). Finally, the letter concluded:

> To the extent that you have disagreement with the foregoing [regarding the assertion of the privilege with respect to the MOU question], as we have in the past, we are willing to engage in a telephonic or in person meet and confer. And should Esprito Santo Bank ever be required to testify as to the matters of which you have inquired, we would seek an appropriate confidentiality order.

Later, on December 6, 2012, TF and AD had a conference call regarding the claimed privileges. There is a dispute as to what was agreed during the call. AD insists that no agreement was reached on the December 6 conference call. In a follow up letter Freedman wrote to Davis on December 10, 2012 (the "December 10 Letter"), Freedman referenced an agreement between AD and TF that providing information on ESB loans was not a waiver of rights or privileges. Through a series of statements, Freedman then indicated ESB had not been criticized by state or federal regulators with respect to several transactions related to Banco Santos identified in the letter.

AD also sought to examine Martin Prego, another employee of ESB. However, because the Angulo-Levine exam ran long, the parties decided to postpone Prego's deposition. During the interim, Prego ceased his employment at ESB. AD was informed of his departure during the December 6 conference call. After AD requested Prego's address and contact information so AD

could issue a subpoena to Prego directly, on January 2, 2013, along with advising that a response to a subpoena with Prego's contact information would be forthcoming, Freedman wrote, "Please coordinate future depositions with us." In response, Da Silva of AD asked "Do you represent Mr. Prego? If not, what is the basis for your role in coordinating his deposition?"  Freedman answered, "I expect that I will be representing him at depo but will be attending either way.  Did not think asking you to coordinate it with me would be controversial."

AD ultimately took Prego's 2004 examination on April 3, 2013.  Meanwhile, without telling TF, AD conducted another examination and an interview of two former ESB employees. One former employee was Carlos Lloreda, whose 2004 examination was taken on January 23, 2013. Lloreda had not worked for ESB in seven years prior to his 2004 examination. AD did not directly inform TF of this 2004 examination; however, AD filed a notice of taking the Lloreda Rule 2004 examination in the main bankruptcy case on January 11, 2013.[9] Prior to the start of the examination with Lloreda, Davis instructed Lloreda not to disclose anything Lloreda may have discussed at any time with any lawyer including ESB counsel.[10]  At the time of the 2004 Examination, Lloreda was not represented by counsel.[11]

In February of 2013, attorneys from AD traveled to Uruguay to interview Alvaro Diez de Medina, another former employee of ESB. Medina had not been employed by ESB for at least seven years prior to his interview. Before interviewing him, AD asked TF via e-mail if Medina was still employed by ESB, to which a TF paralegal responded: "No." Then, a month later, Da Silva of AD contacted Freedman to ask about Medina's employment. While AD asked TF to confirm Medina was no longer an employee of, or had any relationship with ESB, AD never

---

[9] Case No. 10-47543-BKC-LMI, ECF #28.

[10] By Davis: Let me give you some basic ground rules as to how this process works. Let me say first one caution. To the extent you ever have information in response to any of my questions that you learned from a lawyer that is representing Espirito Santo Bank or any of your other employers or your own lawyer, do not tell me that.
By Lloreda: Okay.

[11] TF began to represent Lloreda in February of 2014, long after the Rule 2004 examination.

affirmatively advised TF that AD intended to interview Medina. Conversely, no one at TF ever asked anyone at AD why they wanted to know Medina's current relationship with ESB or why AD was seeking to locate Medina. Following the interview with Medina, AD sent a draft affidavit for Medina to review, revise as necessary and to sign; the affidavit was never returned or signed. In November of 2013, TF notified AD that further contact with Medina would need to be through TF as Medina's counsel.

After the examinations and the interview, Aguiar prepared the complaint against ESB. Aguiar provided a copy of the complaint to ESB in October of 2013, in an effort to resolve the dispute before actual litigation. It was at that time, based on certain allegations of the complaint, that ESB and TF learned for the first time that Aguiar and AD had taken the 2004 examination of Lloreda and had interviewed Medina. The parties mediated unsuccessfully on December 13, 2013, and on December 20, 2013 Aguiar filed the complaint.

ESB filed its Motion to Disqualify on January 29, 2014 seeking to disqualify AD from representation of Aguiar based on AD's alleged improper elicitation of privileged material from Lloreda and Medina as well as its ex parte communications with the two former employees, purportedly in violation of the Florida Rules of Professional Conduct.[12] I set the motion for evidentiary hearing. Subsequently ESB filed the Amended Motion on February 21, 2014 which clarified the privileges it alleges AD violated in its questioning of Lloreda and Medina and supplemented the list of professional rules AD allegedly violated.[13] The Amended Motion also sought relief against Aguiar as Plaintiff, including striking the complaint.

After considering objections filed by Aguiar alleging prejudice caused by the last minute filing of the Amended Motion, I ruled that I would go forward with the Amended Motion but

---

[12] ECF #24.
[13] ECF #79.

would not consider whether and to what extent those allegations should disqualify Aguiar as Plaintiff . I then conducted a two day trial on the Amended Motion, subject to those limitations.

### Summary of Dispute

This dispute involves, at best, an unfortunate breakdown in communication; at worst, a violation of various rules of the Florida Rules of Professional Conduct (the "Rules" and, individually, the "Rule"); and at a minimum, a disappointing lack of professionalism.

The rules involved in this dispute are:

Rule 4–4.2: Communication with Person Represented by Counsel

Rule 4–4.3: Dealing with unrepresented persons

Rule 4–4.4: Respect for Rights of Third Persons

Rule 4–8.4(c): Misconduct

Rule 4–3.4: Fairness to Opposing Party and Counsel

Rule 4–4.1: Truthfulness in Statements to others

The consequences of the relief sought are potentially severe and go beyond ESB's request that AD be disqualified or sanctioned and extends to the adverse impact on the professional status of each of the attorneys accused of misbehavior. Whether there would be professional consequences based on such findings and what would be the severity of those consequences lies with the Florida Bar and the Florida Supreme Court.[14]

In reviewing the alleged violations, I have focused in each instance on the Rule itself as the standard by which AD's actions must be judged for the purpose of determining whether those rules have been violated. As the Preamble to the Rules directs, the Rules are "authoritative," but "[t]he comments are intended only as guides to interpretation. . ." FLA. BAR RULES PREAMBLE.

---

[14] The Florida Bar enforces the Rules but the ultimate decision maker on any sanctions arising from violations of those Rules is the Florida Supreme Court.

ESB accuses AD of hiding the Lloreda examination and the Medina interview from TF for the purpose of eliciting the information that ESB had asserted during the deposition of Angulo-Levine might be privileged. TF argues that, because AD improperly elicited privileged information from Lloreda and Medina, its client has been harmed in such a way that the only appropriate remedy is to disqualify AD in addition to sanctioning AD for its improper conduct.[15] In order to resolve this, I must first determine whether the information elicited by AD from Lloreda and Medina was privileged. Next, regardless of whether that information was privileged, I must determine if the facts and circumstances surrounding the Lloreda examination and the Medina interview warrant a finding that AD's attorneys violated any of the aforementioned Rules. Finally, if I find that either the information was privileged, or that the Rules were violated, I must also decide whether disqualification or sanctions—or both—are appropriate.

**The Testimony and Information Elicited By Astigarraga Davis**
**Does Not Fall Within The Claimed Privileges.**

There are three banking privileges asserted by ESB—the common law banking privilege, and privileges arising under 12 CFR §309.6 and Fl. Stat. §655.057. There is a dispute regarding which privileges are being relied upon, and even Freedman, in his affidavit, displays confusion regarding whether ESB is relying on the independent common law Banking Examination Privilege or a common law banking privilege derived from the state and federal laws referenced. For purposes of this ruling I will address all three.

<u>**The Privileges**</u>

The Banking Examination Privilege is a federal common law privilege. *See In re Subpeona Served Upon the Comptroller of the Currency,* 967 F.2d 630 (D.C. Cir. 1992) ("*Fleet*"); *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, 2013 WL 5660247, at *2

---

[15] And, as already noted, in the Amended Motion, TF argues the "taint" extends to the Plaintiff, Aguiar, himself. That issue will be addressed by separate order.

(S.D.N.Y. Oct. 16, 2013). This qualified privilege "shields from discovery only agency opinions or recommendations." *Fleet*, 967 F.2d at 635. *See also Raffa v. Wachovia Corp.*, 2003 WL 21517778, at *2 (M.D. Fla. May 15, 2003); *In re Bank One Sec. Litig., First Chicago S'holder Claims,* 209 F.R.D. 418, 426 (N.D. Ill. 2002). Because this is a qualified privilege, when a party seeks discovery that would otherwise be subject to the privilege, courts engage in a balancing test, outlined in *Fleet,* to determine whether the otherwise privileged material should be produced.  That test is not relevant to the circumstances before me other than to note that the privilege is not absolute.

Although the Eleventh Circuit has not explicitly recognized the common law Banking Examination Privilege, it has recognized the deliberative process privilege. *See Miccosukee Tribe of Indians of Florida v. U.S.*, 516 F.3d 1235 (11th Cir. 2008) ("*Miccosukee Tribe*"). "The deliberative process privilege shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Export-Import Bank of the United States v. Asia Pulp & Paper Co., Ltd.,* 232 F.R.D. 103, 108 (S.D.N.Y. 2005) (citations omitted). Several courts have recognized that the deliberative process privilege gives rise to the Banking Examination Privilege.  *See In re Providian Fin. Corp. Sec. Litig.*, 222 F.R.D. 22, 26 (D.C. Cir. 2004); *Raffa*, 2003 WL 21517778, at *2; *In re Bank One Sec. Litig.*, 209 F.R.D. at 426. In *Raffa*, the district court specifically relied on the Eleventh Circuit's recognition of the deliberative process privilege in reviewing the Office of the Comptroller of the Currency's assertion of the Bank Examination Privilege. 2003 WL 21517778, at *2.

As the Eleventh Circuit held in *Miccosukee Tribe*, "[t]he purpose of the deliberative process privilege is to protect the quality of the agency's decision-making process." 516 F.3d at

1263. To determine whether the deliberative process privilege may be applied, the party invoking the privilege is required to demonstrate two things.

> First, the material must be pre-decisional, *i.e.,* "prepared in order to assist an agency decision maker in arriving at his decision." Second, it must be deliberative, "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters."

*Id.* at 1263 (citations omitted). Moreover, "[e]ven factual material contained in a 'deliberative' document may be withheld pursuant to the privilege where disclosure of the factual material would reveal the deliberative process or where the factual material is so inextricably intertwined with the deliberative material that meaningful segregation is not possible." *Id. See also In re Bank One Sec. Litig.,* 209 F.R.D. at 427; *Raffa,* 2003 WL 21517778 at *2; *accord Fleet,* 967 F.2d at 634.

Section 309.6(a) of Title 12 of the Code of Federal Regulations, an FDIC regulation, dictates that "no person shall disclose or permit the disclosure of any exempt records, or information contained therein." 12 C.F.R. §309.6(a). Exempt information is defined as: "Records that are contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of the FDIC or any agency responsible for the regulation or supervision of financial institutions." 12 C.F.R. §309.5(g).

Section 655.057 of the Florida Statutes provides state statutory protections with respect to bank regulator examinations and reports. Section 655.057(1) provides, in part, that "all records and information relating to an investigation by the office are confidential and exempt from the provisions of [Florida's public records law] until such investigation is completed or ceases to be active." Fla. Stat. §655.057(1). Further, "[a]fter an investigation is completed or ceases to be active, portions of such records relating to the investigation shall be confidential and exempt from [Florida's public records law] to the extent the disclosure would: … (b) Impair the safety

and soundness of the financial institution; … or (f) Reveal investigative techniques or procedures." *Id.*

Section 655.057(2) states that "reports of examinations, operations, or condition, including working papers, or portions thereof, prepared by, or for the use of, the office or any state or federal agency responsible for the regulation or supervision of financial institutions in this state are confidential and exempt from the provisions of [Florida's public records law]." Fla. Stat. §655.057(2). Unlike section 655.057(1), section 655.057(2), subject to certain exceptions not relevant to this dispute, shields the internal reports and working papers as confidential even after the conclusion of the investigation. *Id.* These internal reports and working papers are not subject to the otherwise mandatory disclosures under a portion of Florida's "Government in the Sunshine" laws—Fla. Stat. §119.07(1).

## No Privileges Have Been Breached

ESB has the burden to show the statements were privileged.  Privilege "is not a favored evidentiary concept in the law since it serves to obscure the truth, and it should be construed as narrowly as is consistent with its purpose." *United States v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987). Accordingly, "the party seeking to assert privilege . . . has the burden of proving the applicability" thereof, in the absence of which the burden cannot be shifted to the opposing party. *In re Fontainebleau Las Vegas Contract Litig.*, 2011 WL 65760, at *10 (S.D. Fla. Jan. 07, 2011).

AD argues that TF had the obligation to articulate precisely what privilege it was asserting on behalf of ESB and TF's failure to do so disqualifies the assertion of such a privilege. A party asserting a privilege must: "(i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing

information itself privileged or protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(d)(2)(A). *See also* Fed. R. Bankr. P. 2004(c) (requiring subpoena under Bankruptcy Rule 9016, incorporating Rule 45, in order to compel attendance of a non-debtor). Conclusory statements are insufficient to establish the privileged nature of information. *Schreiber v. Society for Sav. Bancorp, Inc.*, 11 F.3d 217, 221 (D.C. Cir. 1993) (holding that a conclusory affidavit alone was insufficient to establish privileged nature of bank examination document).

AD correctly argues that the issue of a privilege, although raised at the Angulo-Levine examination, certainly was not confirmed. However, the grounds for asserting privilege were set forth in the November 30 Letter. Nevertheless, the privileges have been asserted only in connection with the question asked of Angulo-Levine, so in determining the context of the asserted privilege in this case, I must start there.[16]

I take pause to note that I, and even TF, used the word elicited—not solicited.  There is no dispute what questions were asked of Lloreda, because those are part of a recorded deposition.  There is a question what information was asked of Medina in his interview, as there is not a recorded series of questions and answers.  Both Da Silva and Davis of AD testified they did not affirmatively ask Medina for any information that ESB argues was privileged and their testimony was not contradicted. In other words, it is not the questions that are at issue, but the answers.

The Banking Examination Privilege, the Florida statutory privilege under section 655.057, and the federal statutory privilege under 12 C.F.R. §309.6(a), each exist to protect financial institutions and their regulators. However, none is all encompassing.  Florida Statute §655.057(1) is not applicable because there is no dispute that the Florida investigation and

---

[16] I have also considered the email exchange regarding "back-to-back" loans and "know your customer" procedures, as general and undifferentiated as any such privilege was expressed therein, into consideration in my ruling.

associated report were completed. Additionally, Florida Statute §655.057(2) and 12 CFR §309.6 do not apply because each applies only to documents and records. The language of the Florida Statutes and the federal regulation each are unambiguous and clear, and I am not at liberty to expand the meaning of an unambiguous Florida Statute, *Daniels v. Fla. Dept of Health*, 898 So. 2d 61 (Fla. 2005), or an unambiguous federal regulation, *CBS, Inc. v. Primetime 24 Joint Venture,* 245 F.3d 1217 (11th Cir. 2001). Even if the provisions of 12 CFR §309.6(a) included unwritten (i.e. oral) information, ESB has not proven that any of the information provided by Lloreda or Medina fell within the proscription of 12 CFR §309.5(g), or if such records even exist. Indeed, it appears ESB took the position that the information that Lloreda and Medina testified or spoke about *was not* contained in any records.

ESB asserts that the common law Banking Examination Privilege extends to the contents of documents subject to the privilege, whether expressed verbally or otherwise. That assertion is unsupported by the law on which ESB relies. Other than citing to discussions of the deliberative or banking examination privilege within particular cases, ESB failed to cite any case that extends these privileges beyond documents. Every case I reviewed in preparing this opinion arose from a request for documents and centered around whether and in what circumstances those requested documents had to be or did not have to be produced. There was one case—*Raffa v. Wachovia Corp.*—where the dispute was the use of an Office of the Comptroller of the Currency document in a complaint, which document had been produced by a third party. I am not willing to make the huge leap that ESB asks me to make—that is, expand the Banking Examination Privilege from documents to oral statements without more support than has been provided.

However, even if the common law Banking Examination Privilege did extend to oral communications, I find that the privilege is not triggered in this circumstance. In each instance,

ESB has failed to prove that any of the information provided by Lloreda or Medina was other than factual, and has failed to prove that any of the information was either pre-decisional or deliberative, or so intertwined with a pre-decisional or deliberative record to trigger the privilege.

Thus, ESB has failed to prove that AD or Aguiar obtained or used any privileged information in the investigation leading up to, or in the drafting of, the complaint.

### Neither the Lloreda Examination nor the Medina Interview was a Violation of the Florida Bar Rules of Professional Conduct

TF argues that even if the information elicited from Lloreda and Medina was not privileged, the manner in which AD went about the Lloreda examination and the Medina interview, and the failure of AD to provide Lloreda and Medina certain preliminary instructions, all violate several different Florida Bar rules and warrant sanctions, including disqualification.

TF insists that AD was obligated to advise Lloreda and Medina (a) that each of them had the right to counsel, (b) that ESB was represented by counsel, (c) that ESB was providing representation to other former employees of ESB, (d) that ESB was asserting the three privileges, and (e) that ESB did not know that AD was interviewing or examining them (collectively the "Advance Disclosures"). ESB also emphasizes in its pleadings and closing that AD brought documents to the examination and the interview to "refresh the witness' recollection,"[17] and with respect to the Medina interview, that Da Silva drafted the affidavit for Medina's review.[18]

I will address the Advance Disclosures and other concerns addressed by TF in the context of the various rules ESB claims were violated.

---

[17] TF has not explained how using a document to refresh a witness' recollection is problematic other than such practice might possibly be used to compromise testimony at trial.

[18] TF argues that evidence of AD's wrongdoing is that Da Silva actually drafted the affidavit, although he made clear in his email correspondence with Medina that the affidavit was subject to any revisions, corrections, or deletions Medina might wish to make, and also, that in a few instances Da Silva included questions for Medina in the draft affidavit and email, including a question asking Medina to clarify to which regulator(s) (Florida or federal) Medina had referred in his interview. However, all of these complained about actions are consistent with the way that witness interviews are generally conducted, and thus I will not address these complaints again.

**Rule 4-4.2: Communication with person represented by counsel**

Rule 4-4.2 (a) provides:

In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer. Notwithstanding the foregoing, an attorney may, without such prior consent, communicate with another's client in order to meet the requirements of any court rule, statute or contract requiring notice or service of process directly on an adverse party, in which event the communication shall be strictly restricted to that required by the court rule, statute or contract, and a copy shall be provided to the adverse party's attorney.

FLA. BAR RULE 4-4.2(a).

AD did not violate this Rule. Neither Medina nor Lloreda was represented by counsel at the time AD communicated with them. In fact, as stipulated by the parties, Freedman did not represent either of them until long after either the Lloreda examination or the Medina interview took place. The law in Florida is clear and unambiguous—a former employee of a party is NOT considered the party for purposes of this rule. *HBA Mgmt., Inc. v. Estate of Schwartz*, 693 So. 2d 541, 546 (Fla. 1997) ("*HBA Management*"). The fact that if either Lloreda or Medina had contacted ESB, ESB might have offered to provide an attorney if they desired one at the time of the examination or interview, does not change this result.[19]

ESB's reliance on *Rentclub, Inc. v. Transamerica Rental Fin. Corp.*, 811 F. Supp. 651 (M.D. Fla. 1992) *aff'd*, 43 F.3d 1439 (11th Cir. 1995) ("*Rentclub*") to contradict *HBA Management* is misplaced. *Rentclub* was decided five years before *HBA Management* and the 11th Circuit affirmance predates *HBA Management* by two years, and thus, neither federal court had the benefit of the Florida Supreme Court's ruling on this exact issue. In ruling that a law

---

[19] In support of the motion, TF provided an affidavit from Lloreda (who also testified at trial), in which Lloreda stated that he would have contacted ESB and accepted such representation from ESB had AD informed him that the other former employees were being provided representation. While noted, this testimony is not relevant to the issue before me.

firm had to be disqualified, the *Rentclub* court reviewed very disturbing facts and held that Rule 4-4.2 "prohibits attorneys from directly communicating with adverse parties, including employees or former employees of the corporate parties represented by counsel." *Id.* at 654. That particular interpretation of Rule 4-4.2 (applied to former employees) was expressly *rejected* in *HBA Management*, 693 So. 2d at 545. The interpretation of a Florida Bar rule by a federal court does not survive a different interpretation by the ultimate arbiter of those rules—the Florida Supreme Court.

As the Florida Supreme Court held in *HBA Management*:

When a corporation or other organization is known to be represented with respect to a particular matter, the bar applies only to communications with those employees who have managerial responsibility, those whose act or omission may be imputed to the organization, and those whose statements may constitute admissions by the organization with respect to the matter in question.

*Id.* at 545-46.

According to the Florida Supreme Court, when contacting former employees there are only two restrictions counsel must consider—not intruding on the attorney client privilege[20] and proceeding in accordance with Rule 4-4.3 if the former employee is otherwise unrepresented, which rule I will address next.

Moreover, while ESB repeatedly accuses AD of failing to provide the Advance Disclosures, such a failure is not relevant to determining whether *this* Rule was violated. That argument, to the extent it is supported by law, is relevant to whether AD violated Rule 4-4.3 and the other Rules I will address.

---

[20] There is no dispute that Davis gave a clear instruction to Lloreda regarding the attorney client privilege and Davis testified, without contradiction, that he always advises persons whom he is deposing or interviewing about the attorney/client privilege. Presumably, Davis gave the same cautions to Medina. There was certainly no evidence that he did not.

**Rule 4–4.3: Dealing with unrepresented persons**

> (a) In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested. When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in the matter, the lawyer shall make reasonable efforts to correct the misunderstanding. The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel.

FLA. BAR RULE 4-4.3(a).

The Rule warns "a lawyer shall not state or imply that the lawyer is disinterested." *Id.* While AD did not inform Lloreda or Medina that its representation was adverse to ESB, AD did not say it was disinterested.  Consistent with what Davis told Freedman, Davis told Medina and Lloreda that AD would "go where the evidence takes them." In fact, ESB has not shown that at the time of either the Medina interview or the Lloreda examination that Aguiar had or had not made any final determination requesting any cause of action against ESB. Indeed, Davis' testimony suggests the contrary.

The comment to Rule 4-4.3 explains that to avoid a misunderstanding, a lawyer may need to "explain that the [lawyer's] client has interests opposed to those of the unrepresented person." FLA. BAR RULE 4-4.3 cmt. At no time were Aguiar's interests adverse to either witness, and even if Aguiar's interests were adverse to ESB, nothing in this Rule required AD to disclose that information.

ESB argues that AD had an obligation to give Lloreda and Medina the Advance Disclosures.[21] But AD's failure to give either Lloreda or Medina the Advance Disclosures did not violate Rule 4-4.3. ESB insists the privileges it asserted are so sacrosanct that these privileges rise to the same level as the attorney client privilege and therefore, as with the attorney-client privilege, cautionary warnings were required before the examination and

---

[21] There is no evidence that ESB provided counsel to more than one former employee—Prego.

interview. ESB has failed to provide support for this argument.  All the authorities ESB cited are cases dealing with the attorney-client privilege and ESB has provided no persuasive argument why the banking privileges, statutory, regulatory or common law, should rise to the same level as the attorney-client privilege. Moreover, those privileges are not ESB's to assert, but only to protect, as I will soon address in more detail.

ESB also failed to cite to any authority to support its argument that AD had an obligation to advise either Lloreda or Medina that he should get an attorney. Interestingly, ESB does not cite the portion of this Rule that warns "the lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel." FLA. BAR RULE 4-4.3(a). Does this mean, as ESB argues, that AD had an affirmative obligation to tell either Lloreda or Medina to get a lawyer? The comments do not address this at all; rather, the comments suggest that Rule 4-4.3(a) is an exception to the absolute proscription that the lawyer cannot advise the unrepresented person at all when dealing with the unrepresented person.

Rule 4-4.3 is an adoption of the ABA Model Rule and has been adopted in many other states. *See* MODEL RULES OF PROF'L CONDUCT R. 4.3. There are hundreds of cases around the country that discuss this Rule.  Presumably if any court interpreted this Rule as an affirmative obligation to advise an unrepresented person of his or her right to counsel, ESB would have brought such a case to my attention.  Moreover, my review of several cases failed to uncover any court that addressed this portion of the Rule, let alone held that such an obligation exists. *See, e.g.*, *Suck v. Sullivan*, 1999 WL 33437564, at *2 (Mich. Ct. App. Aug. 27, 1999) ("MRPC 4.3 does not impose a duty on an attorney to recommend that a person who is not represented by counsel confer with an attorney under any circumstances.") AD correctly points out, this is not a

criminal proceeding and AD is not the government.  ESB has not cited to any authority—because none exists—that AD had any obligation whatsoever to advise Lloreda or Medina as it suggests.

Not only did AD have no obligation to advise either Lloreda or Medina that either had the right to an attorney, AD had no obligation to advise either of them that ESB had retained an attorney or had provided an attorney for a former employee who had recently left ESB. Lloreda and Medina were perfectly capable of contacting ESB about the examination or interview if either had chosen to do so. Moreover, both Lloreda and Medina knew that AD had taken the deposition of Angulo-Levine; thus they knew that ESB had been questioned.  Whether Lloreda or Medina might think Angulo-Levine appeared at a deposition without an attorney is not something I can glean from the evidence. But, I presume Lloreda and Medina are sophisticated enough to assume an attorney was present on Angulo-Levine's behalf.  Furthermore, there was no basis for anyone to suppose that ESB's willingness to represent an employee who had recently been terminated would translate into a willingness to provide legal counsel to two people who had not been employed by ESB for at least seven years.  Finally, it is clear from the record that AD made every effort, through TF, to determine whether Medina had any continuing relationship with ESB before contacting him directly, inquiring as to Medina's whereabouts and status on at least three separate occasions.

## Rule 4-4.4: Respect for Rights of Third Persons

 (a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person or knowingly use methods of obtaining evidence that violate the legal rights of such a person.
 (b) A lawyer who receives a document relating to the representation of the lawyer's client and knows or reasonably should know that the document was inadvertently sent shall promptly notify the sender.

FLA. BAR RULE 4-4.4(a) & (b).

ESB argues that AD violated this Rule because AD failed to advise either Lloreda or Medina of the Advance Disclosures.

I can quickly dispense with Rule 4-4.4(b). This Rule clearly does not apply because no document was ever requested or ever produced.  Nonetheless, ESB argues this Rule applies because the comments to the Rule note that its purpose is to prevent one side from gaining an unfair advantage over another. The issue of unfair advantage is one I will address, but since there is no document involved in this dispute, Rule 4-4.4(b) clearly does not apply and AD did not violate it.

I now turn to Rule 4-4.4(a). The third parties whose rights were violated, according to ESB, were ESB, the FDIC and the OFR, because AD "improperly intruded into privileged relationships, relationships of which ESB was a direct beneficiary."[22] I ruled above that the Advance Disclosures were not information that AD was legally, ethically or morally obligated to provide to either Lloreda or Medina. Thus AD's failure to advise Lloreda and Medina does not violate this Rule.  Moreover, the banking privileges invoke no different consideration. ESB correctly acknowledges that the banking privileges belong to the regulators. *See In re BankOne Sec. Litig.*, 209 F.R.D. 416*, Raffa,* 2003 WL 21517778, at *2.  However, nothing in the statute, regulations or case law suggests that the relationship between bank and regulator is a privileged relationship that overrides or supersedes the Florida statutory limitations, the federal regulatory limitations, or the qualified common law privilege. The obligation ESB says it owes to the regulators arising from its relationship to the regulators is to protect the asserted privileges on behalf of those entities.  ESB has done so by raising the possible privilege issue at the Angulo-Levine deposition and by advising AD that, should AD ask ESB to testify regarding these

---

[22] This argument stems from the comment to Rule 4-4.4 which explains that rights of third persons "include legal restrictions on methods of obtaining evidence from third persons and unwarranted intrusions into privileged relationships, such as the client-lawyer relationship." FLA. BAR RULE 4-4.4, cmt.

matters, ESB would seek a confidentiality order. ESB concedes that it is not bound by the statements made by Lloreda and Medina.

I ruled above that the privileges held by the regulators relate to documents and at no time did AD ask for documents or receive documents from either Lloreda or Medina. No legal rights were compromised, nor were relationships interfered with. Thus, ESB has failed to demonstrate that AD has violated Rule 4-4.4(a).

## 4-8.4(c): Misconduct

A lawyer shall not . . .

  (c) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, . . .

FLA. BAR RULE 4-4.8(c).

ESB asserts that AD violated this Rule by conducting "secret" discovery, and doing so after TF requested that future depositions be conducted through Freedman.  ESB also argues that AD's failure to give Lloreda and Medina the Advance Disclosures violated this Rule as well.  I have already explained why AD was not obligated to make any of the Advance Disclosures to Lloreda and Medina, and therefore, AD's failure to do so did not violate this Rule.

AD did not engage in "secret" discovery, although it is clear there was a disconnect between AD and TF.  It is unclear whether this apparent misunderstanding could have been resolved by communicating directly rather than by e-mail, but that is of no moment here.  AD did not hide the fact that it was taking Lloreda's examination, nor did AD hide the fact that it was looking for Medina. With respect to Medina, AD made two things clear to TF. One, that AD was trying to find Medina, and two, that AD wanted to confirm whether or not Medina was still an employee of ESB.  There is no evidence, and it was not argued by ESB, that TF ever asked AD *why* the firm was looking for Medina or *why* AD wanted to know Medina's current employment

status with ESB. Presumably, if AD contacting Medina was of any concern to ESB, someone at TF would have inquired further.

While AD did put the Lloreda 2004 examination on the main case docket, it did not need to do so. Thus, whether TF filed a notice of appearance in the main case is not of any consequence. No local rule or rule of civil procedure required AD to tell ESB that it was taking the depositions of, or interviewing, former employees. Indeed, as the Florida Supreme Court in *HBA Management* held, this is the case even if the former employees from whom discovery is sought are the very actors whose actions gave rise to the claims for which the discovery is sought.

> That former employees may have engaged in 'action or inactions' while they were employed that may give rise to liability of the employer is simply a matter of historical fact . . . [T]here is no valid reason to distinguish between former employees who witnessed an event and those whose act or omission caused the event.

*HBA Management*, 693 So. 2d at 546 (citations omitted)

However, there is the issue of the email exchange in which one email from Freedman stated that all future depositions should be coordinated through him. As detailed above, this request appeared in the middle of an email discussion addressing AD's attempts to schedule former employee Prego's deposition. In reviewing the email chain the request certainly appears to be a request limited to coordination of any future depositions of Prego, not a broad sweeping request as is now argued in hindsight. While the first email in the chain includes a request for information regarding Medina's whereabouts and the status of his current relationship with ESB, as well as Prego's contact information, all the subsequent emails in this chain relate to Prego's deposition; there was no further mention of Medina by anyone at TF. It is possible, as Freedman now claims, he meant that *all* depositions AD took which related to ESB were to be coordinated

through him. It is also reasonable that AD did not understand that to be the case because that statement—even in context—says no such thing.

Even if Freedman's statement was intended to include all depositions, AD's failure to understand such intent is clearly excusable and does not reflect any dishonesty, fraud, deceit or misrepresentation. On the other hand, if Freedman thought he meant all depositions relating in any way to ESB, it is reasonable that he would have assumed that, if AD had an objection to coordination of future depositions, AD would have said something. This is especially likely considering AD asked before why TF wanted to be involved in the examination of former employee, Prego. This was, at worst, a legitimate miscommunication between the parties, and it does not give rise to a Rule violation.

ESB also has not proven there was any other agreement in place that AD violated such that this Rule would be implicated. The November 30 Letter does not reflect any agreement regarding discovery. The statement in the letter that "should Esprito Santo Bank ever be required to testify as to the matters of which you have inquired, we would seek an appropriate confidentiality order," can only reasonably be interpreted to mean, especially in light of the events that preceded the letter, that if AD tried to re-set ESB's deposition, or question ESB regarding the questions that Angulo-Levine declined to answer at her examination, then ESB would seek a confidentiality order, not a protective order. There is nothing in the sentence, or in the entire letter, as ESB argues, to suggest that AD was going to avoid taking any discovery relating to ESB and the "back-to-back" loan transactions about which Angulo-Levine was questioned and testified, without first going to court and getting a ruling on the privilege issue that had been asserted by ESB.  Indeed, this underscores Davis' testimony that every discussion on this issue focused on relevancy and confidentiality rather than privilege.

Finally, the parties dispute that any agreement was reached during the phone conversation of December 6, 2012. Davis testified that no agreement was reached except that all parties reserved all of their rights with respect to the asserted privilege. Freedman testified he understood that the agreement was "I would provide them a writing expressing that (1) nothing in the writing shall be deemed a waiver of any rights, privileges or objections that ESB may have in respect to their inquiry; and (2) that ESB had never been criticized by any regulator with respect to the Banco Santos related depository accounts or loan relationships. The only caveat to the resolution was that the Banco Santos' Trustee would reserve his right to contest ESB's assertion of the privilege and objections raised in the November 30, 2012 letter."    I accept that both attorneys are being truthful regarding what they believe and recall was the result of that conversation. Still, the evidence shows a misunderstanding between the parties as to how to proceed, but not an agreement regarding any third party discovery. A misunderstanding does not satisfy ESB's burden to show that AD was fraudulent, deceitful, or misrepresented anything.

The fact that all of this was taking place while Prego's deposition was being coordinated does show that it would have been professional and appropriate to mention these interviews and depositions, especially in light of Davis' statement regarding transparency. That being said, AD's decision not to do so did not violate this Rule. ESB's speculation that AD purposely delayed the Prego deposition is (a) only speculation, (b) unsupported by the evidence that shows that all parties had scheduling issues that caused the delay, and (c) irrelevant to the issue before me.

## Rule 4–3.4: Fairness to Opposing Party and Counsel

A lawyer shall not:

(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists;

25

(d) in pretrial procedure, make a frivolous discovery request or intentionally fail to comply with a legal proper discovery request by an opposing party; . . .

FLA. BAR RULE 4-3.4(c) & (d).

This Rule does not apply to the allegations of this dispute. ESB argues that the "secretive discovery efforts" and asking questions, the response to which included information ESB asserts is privileged (and therefore required a prior determination by the court), violate this Rule. I have already addressed each of these arguments in this opinion.

ESB accuses AD of misleading TF "into believing that if it chose to seek the Privileged information, that it would seek a Court ruling before launching into those areas." There is absolutely no evidence to support this allegation. AD has not "admitted" it violated this Rule; AD simply acknowledges that the ultimate determination of the privilege is by the court. But that issue was not in a procedural posture for court review. As I already noted, the November 30 Letter did not in any way suggest that AD could not ask anyone else questions relating to ESB, the "back-to-back" loans, or examinations. Nor did the December 6 phone conversation, or the December 10 Letter, in any way implicate the necessity of the court's involvement in the Aguiar's investigation except as to specific questions asked of ESB and only subject to a confidentiality order.

Moreover, ESB has not argued that AD solicited this testimony. In other words, AD did not ask impermissible questions, rather, it received allegedly privileged responses. So even if ESB had been present at the Lloreda examination, or the Medina interview, there is no basis to believe ESB would have objected to the questions, as they were asked, that gave rise to the problematic responses, because the questions were not directed to elicit this testimony. The problematic answers would not have been "stricken" at the deposition or the interview, although ESB might have asked that the Lloreda transcript be sealed (as it has here). Procedurally, what

would have occurred is, if Aguiar had tried to use those responses at trial, ESB could have objected and then the court would have ruled on the privilege issue.  AD did not "delve into matters previously asserted as privileged" because the few questions AD asked that were related to this testimony are similar to responses provided without objection by Angulo-Levine and Prego in their respective examinations.

ESB argues, however, that AD had an affirmative duty to instruct both Lloreda and Medina *not* to disclose any information that ESB had asserted was privileged and therefore these answers would never have been elicited.  I have already addressed and rejected this argument.

### Rule 4–4.1: Truthfulness in statements to others

In the course of representing a client a lawyer shall not knowingly:

> (a) make a false statement of material fact or law to a third person;

FLA. BAR RULE 4-4.1.

> The comment to this Rule provides:

> A lawyer is required to be truthful when dealing with others on a client's behalf, but generally has no affirmative duty to inform an opposing party of relevant facts.  A misrepresentation can occur if the lawyer incorporates or affirms a statement of another person that the lawyer knows is false.  Misrepresentations can also occur by partially true but misleading statements or omissions that are the equivalent of affirmative false statements.

*Id.* cmt.

ESB argues that AD "completely misled Lloreda and Medina" because, in addition to failing to give the Advance Disclosures, AD did not advise either Lloreda or Medina that Aguiar was adverse to ESB at the time of the examination and interview.  I have already dealt with the Advance Disclosures and an affirmative obligation to disclose the alleged adverse position, so I

will focus on whether AD deliberately misled Lloreda or Medina as to whether the Aguiar was adverse to ESB at the time each was examined or interviewed.

There is no evidence that, at the time of the Lloreda Examination or the Medina interview, the Aguiar was, in fact, adverse to ESB. There is no question that ESB was being investigated. Indeed, Lloreda asked during his examination if Aguiar intended to sue ESB. Consistent with what Davis told Freedman during the Angulo–Levine deposition in response to Freedman's question whether ESB was a litigation target, Davis said they would go where the evidence led them. Da Silva does not recall if either he or Davis told Medina that Aguiar was investigating ESB, although he argues a possible lawsuit is included in the "assets" Da Silva told Medina AD was investigating. Thus, ESB has failed to prove there was any misrepresentation.

## Should Astigarra Davis Be Disqualified or Sanctioned?

### Disqualification

A party moving to disqualify counsel bears a heavy burden to demonstrate appropriate grounds for such relief. *See In re BellSouth Corp.*, 334 F.3d 941, 961 (11th Cir. 2003) (internal citations omitted) ("The party moving to disqualify counsel bears the burden of proving the grounds for disqualification."), *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 794 (2nd Cir. 1983) (noting that a movant's task in seeking removal of opposing counsel is a "heavy burden"). Further, in cases where disqualification of an attorney is based on an alleged ethical violation, "the court may not simply rely on a general inherent power to admit and suspend attorneys, without any limit on such power." *Schlumberger Technologies, Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997). As such, courts will not "deprive an attorney of the opportunity to practice his profession on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of the conduct." *Id.*

(internal citations and quotations omitted).  Indeed, "[d]isqualification is a harsh sanction, often working substantial hardship on the client," and "disqualification should [accordingly] be resorted to sparingly . . ." *Norton v. Tallahassee Mem'l Hosp.*, 689 F.2d 938, 941, n.4 (11th Cir. 1982).

Furthermore, when the basis for disqualification is improper disclosure or receipt of privileged information, the party moving for disqualification must demonstrate both the existence of a privilege and an informational advantage obtained by the party against whom disqualification is sought.  *See*, *e.g.*, *Moriber v. Dreiling*, 95 So. 3d 449, 454 (Fla. 3d D.C.A. 2012) ("The receipt of an inadvertent disclosure warrants disqualification when the movant establishes that: (1) the inadvertently disclosed information is protected, either by privilege or confidentiality; and (2) there is a 'possibility' that the receiving party has obtained an 'unfair' 'informational advantage' as a result of the inadvertent disclosure"); *Miccosukee Tribe of Indians v. Lehtinen*, 114 So. 3d 329, 332 (Fla. 3d D.C.A. 2013) (noting that disqualification of counsel cannot rest on mere speculation that an informational advantage *may have* been gained in the context of case in which counsel had previously represented the opposing party).

I have already held that the information obtained by ESB was not privileged.  I have also held that AD did not violate any of the Florida Rules of Professional Responsibility. These determinations should end the inquiry into whether AD should be disqualified. *See Moriber*, 95 So. 3d at 454 (finding the privilege and information advantage elements for disqualification are necessarily interrelated "because only the inadvertent disclosure of privileged or confidential information can yield an 'unfair' 'informational advantage.'").

Moreover, even if the information obtained was privileged in some respect, it did not create an unfair advantage such that disqualification is appropriate. *See, id.* ("[T]he fact that the

inadvertently disclosed information is privileged or confidential, standing alone, does not automatically warrant disqualification."). AD correctly argues that even if ESB had shown some sort of privilege existed in the information obtained from Lloreda and Medina, none of it is admissible as evidence against ESB as it is hearsay under FRE 801(c) and not former testimony under FRE 804(b)(1). *U.S. v. Walthour*, 202 Fed. Appx. 367, 371 (11th Cir. 2006) (testimony about the contents of a police report is inadmissible hearsay). Additionally, to the extent Lloreda or Medina revealed information contained in an audit, the rules of evidence would preclude that testimony; Aguiar would need to seek admission of the audit (assuming it had been obtained). If Aguiar sought to obtain the audit, then, to the extent the applicable regulator objected, the adjudicating court would need to review the request in light of the balancing test the qualified privilege invokes in such a circumstance.  If the audit was discoverable, it would probably be admissible if it was relevant.  But the examination and the interview have no relevancy to the process I have just described, and therefore, Aguiar has not gained any "unfair" informational or tactical advantage.  The fact that Aguiar has obtained information that ESB would prefer Aguiar not have is not the type of tactical advantage the rules are designed to insulate.

As AD noted in its closing, ESB repeatedly claimed that the audits about which Lloreda and Medina allegedly provided information are irrelevant to Aguiar in this case because they do not discuss the "back-to-back" loans at issue.  If that is true, then none of the "privileges" were implicated because, at best, those privileges, if applicable to oral statements, only apply to information contained in the audits.

ESB has failed to prove that AD violated any of the Florida Rules of Professional Responsibility. ESB has also failed to prove that AD obtained an unfair advantage in litigation by interviewing Medina and taking the examination of Lloreda, such that the only way to purge

the information AD obtained is to disqualify AD.  As I addressed in this opinion, AD did not affirmatively seek the information that ESB asserts is privileged. Moreover, ESB has failed to prove that the fact of an examination, its purpose and its results, as opposed to the records of that examination, is covered by any of the privileges it asserts.  Consequently, the information AD obtained was not privileged and it has no unfair advantage.

This does not mean that AD's conduct was a benchmark of professionalism. This case underscores an ethical tightrope on which attorneys occasionally find themselves. In this profession, attorneys must zealously represent their clients, while staying within the ethical boundaries proscribed by the applicable rules of professional conduct.  Nothing AD did violated the Rules, nor was there any agreement between the parties that required AD to act any differently than it did.  Nonetheless, while Davis longs for a transparent process, it appears that he views transparency in a very different light than I would. AD complains that ESB was not forthcoming in its discovery responses, presumably to explain why AD did not volunteer all aspects of its investigation to ESB and TF.  However, I do not find any of this relevant to the issue I have had to decide.  As is often said in a variety of contexts—"two wrongs do not make a right."

## Sanctions

ESB argues that AD's behavior was so outrageous, so violative of so many Florida Bar Rules of Professional Responsibility, that this Court should sanction AD under its inherent sanction powers.  The court's ability to issue sanctions has been framed by the Supreme Court in *Chambers v. Nasco, Inc.*, 501 U.S. 32 (1991).  In that case, the Supreme Court reemphasized that federal courts have the inherent power to sanction in addition to those powers to sanction provided by, and framed by, various rules of procedure and statutes.

The *Nasco* court wrote that it had "long been understood that certain implied powers must necessarily result to our Courts of justice from the nature of their institution . . ." *Id.* at 43 (internal quotations omitted) (citations omitted). The Court observed that federal courts are "vested" with power to "impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Id.* Finally the Court explained that these powers are necessarily vested so courts may "manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* (citations and quotations omitted).

However, as the Eleventh Circuit observed in *Peer v. Lewis*, 606 F.3d 1306, 1314 (11th Cir. 2010), the Supreme Court admonished that this inherent power "is both broader and narrower than other means of imposing sanctions." Further, "the inherent power's bad faith standard narrows the range of conduct that can satisfy this higher threshold for sanctions." *Id.* at 1314-15. *See also Byrne v. Nezhat*, 261 F.3d 1075, 1121 (11th Cir. 2001) ("[A] finding of bad faith is the key to unlocking the inherent power . . .").

Thus, while I find some of AD's choices disappointing, they are not sanctionable. To the extent that, notwithstanding the parameters for sanctions, I might be inclined to hold someone "responsible" for this entire sideshow, I hold both sides equally responsible, and each of AD and TF , by having to incur what I assume are substantial costs associated with this dispute, have been sanctioned enough.  How these law firms will allocate these expenses between themselves and their respective clients is not something with which I choose to be, or need to be, involved.

**<u>Conclusion</u>**

As I observed when this trial began, Chesterfield Smith once reminded us "[t]he dominant question for tomorrow's lawyers and their clients should be: Is it right? Not: Is it legal?"  This is echoed in the preamble to the Rules of Professional Conduct "The rules do not, however, exhaust the moral and ethical consideration that should inform a lawyer . . ." FLA. BAR RULES PREAMBLE.

This unfortunate episode is a result of miscommunications, misunderstandings, and miscalculations.  Thus, while Freedman might have expected to be consulted about any discovery relating to his client, that is not what he communicated to AD.  And, while AD might or might not have believed that Freedman expected to be consulted, I do not find that anything in the evidence presented to me amounted to an affirmative undertaking to do so.  A great deal about which ESB takes exception appears to have crystallized in hindsight.  Moreover, much of ESB's righteous indignation is exaggerated. Nonetheless, while I find that AD did not violate any of the Rules of Professional Conduct of the Florida Bar, and while I further hold that the information gathered by AD does not warrant disqualification of the firm or sanctions, I do find that AD could have done better. In light of Davis' comment to Freedman that the process would be transparent, it should have been, and it was not.

Accordingly, the Defendant's motion is DENIED.

# # #

Copies Furnished To:
Gregory Grossman, Esq.
Gary Freedman, Esq.

*Attorney Grossman shall serve a copy of this order upon all parties in interest and file a certificate of service with the Clerk of Court.*